ASSOCIATED INDEMNITY CORP. and the American Ins. Co., Plaintiffs,

v.

DOW CHEMICAL COMPANY and Dow Chemical Company of Canada, Inc., Defendants.

No. 85–CV–10398–BC.

United States District Court, E.D. Michigan, N.D.

Jan. 11, 1993.

Charles S. Bergen, Grippo & Elden, Chicago, IL, for Associated Indemn. Corp. and American Ins. Co.

Leisa Hamm, Lord, Bissell & Brook, Chicago, IL for Underwriters at Lloyd's London and Ins. Companies subscribing Policy K25298.

Gregory E. Smith, Legal Dept. Dow Chemical Co., Midland, MI, for Dow Chemical Co. and Dow Chemical Canada, Inc.

CHURCHILL, District Judge.

## MEMORANDUM OPINION

The parties in this action are (1) Dow Chemical Company (Dow) and its wholly owned subsidiary, Dow Chemical Company of Canada, Inc., (Dow Canada), the insured, (2) Associated Indemnity Corporation and The American Insurance Company (collectively Fireman's Fund, the primary insurer and (3) Underwriters at Lloyds London and Insurance Companies Subscribing to Policy K 25298 (London Insurers), the excess insurers. This is one of a series of lawsuits to determine the rights of Dow and its subsidiaries to indemnity and defense of products liability claims under Dow's liability insurance program in effect during the decade of the 70's. The products liability claims in this lawsuit arose from production and sale of gas pipe resin by Dow Canada for the extrusion of pipe to be used in a large rural gasification program in rural Alberta. The gas lines leaked and were eventually replaced at a cost of approximately $30 million (Canadian). The specific issue under consideration is the number of occurrences issue.

In the early 1970's the Province of Alberta, Canada undertook the Rural Gas Program, the purpose of which was to deliver natural gas service to a significant portion of rural Alberta. The system would consist of steel and aluminum high pressure lines and plastic low pressure service lines. Service areas would be organized as co-operatives (co-ops). The low pressure lines were to be constructed with polyethylene pipe which was somewhat flexible and could be plowed into the ground in a single operation. The Alberta Department of Telephones and Utilities (T & U) was the Alberta agency responsible for implementing the program.

## DOW CANADA'S PRODUCT

The necessary polyethylene gas pipe resin for production of the low pressure pipe was purchased from a number of sources, including Dow Canada. Dow Canada produced 4.8 million pounds of high density polyethylene resin for use in the program. The Dow Canada resin was known as N5303. The pipe made from N5303 was known as PE3306. Dow Canada's resin had been certified by the Canadian Standards Association as suitable in 1969 for gas pipe under the designation EP237. The Canadian Standard Association recertified the resin in 1973 in anticipation of its use in the Rural Gas Program.

## PRODUCTION AND DELIVERY OF N5303 GAS PIPE RESIN

In 1973 T & U obtained gas pipe resin from Canada Industries, Ltd. (CIL). CIL

obtained resins from a number of sources to produce gas pipe resin by a blending process.

In late 1973, T & U determined that CIL could not provide enough gas pipe resin to cover its 1974 projected demand. T & U agreed to help Dow Canada obtain ethylene feedstock. Dow Canada agreed to produce five million pounds of polyethylene gas pipe resin.

Dow Canada's gas pipe resin N5303 was produced by blending a mixture of Dow Canada's base resin with carbon black masterbatch in a ratio of 9:1. Carbon black masterbatch was made from carbon black and a low density polyethylene carrier.

Gas pipe was manufactured from N5303 by two different processes.

1. Dow Canada, acting through independent contractors, referred to as compounders, melted, extruded, cooled, pelletized and packaged a mixture of Dow Canada's base resin and carbon black masterbatch. The product was shipped to one of four entities referred to collectively as the "Alberta extruders" who would form the pipe.

2. Dow Canada would provide an uncompounded resin known as N5303 Natural and carbon black masterbatch by an Alberta extruder that had the equipment necessary to mix the base resin and carbon black masterbatch and extrude the resulting mixture into gas pipe in a single operation. This method of manufacturing gas pipe was known as the "salt and pepper" method. Some cost savings were involved. Approximately 17% of the 4.8 million pounds of resin sold by Dow Canada was N5303 Natural.

## TROUBLES GALORE

Neither Dow Canada's resin nor the pipe formed from it were completely homogeneous products. Six entities participated in the compounding of N5303. Four entities were involved in extruding the pipe. Some entities had better quality control than did others. Some N5303 had excessive moisture and excessive foreign materials. Some

N5303 contained off-spec materials. It was transported and stored in different ways.

The pipe was installed by different co-ops in variable soils and in different weather conditions. The co-ops had different designs and had installers who followed different installation techniques.

Some pipe was difficult to install. Some pipe segments developed leaks. Some of the leaks may have occurred during the installation process. Other leaks developed after installation. The leaks in the pipe took different forms.

If there was a pattern of distribution of pipe from different sources to selected co-ops, it does not appear in the record. PE3306 was used by 38 co-ops. Some co-ops had very little apparent difficulty with PE3306. Others had a great deal of apparent trouble.

At first it was believed that the problems could be solved. If an apparent or possible cause of difficulties was identified, steps were taken to eliminate it. When leaks were discovered, they were repaired. The troubles, however, did not end. Leaks continued to develop. Difficulties were experienced with pipe made from resins from other sources, but difficulties with PE3306 were more persistent.

In 1976 the Province of Alberta imposed a moratorium on the installation of PE3306. In 1978 the province decided to offer a program of grants and loans to all co-ops to replace all of the PE3306 with a different kind of pipe. Eventually, under some pressure from the province, all of the co-ops went along with the replacement program.[1]

## THE REASON FOR THE REPLACEMENT PROGRAM

It is an undisputed fact that the decision to encourage the co-ops to replace all PE3306 pipe was precipitated by the 16–page report of Frank G. Rice, P. Eng., entitled "Report On Evaluation of Pipe Quality and Forecast of Serviceability of PE3306 Polyethylene Gas

---

1. The replaced pipe would stretch from Dow's home office in Midland, Michigan, to Fireman's Fund's office in San Francisco.

Piping Laid Under the Rural Gasification Program of the Government of the Province of Alberta During 1974 to 1976." After briefly stating that the report was based upon data set forth in prior reports and upon new data from a recently conducted testing program, the report drew the following conclusions:

1. Even the best pipe made from Dow N5303 is deficient for use in the rural gasification program, particularly at the licensed MOP of 80 psi. It lacks toughness necessary to withstand this operating pressure when additionally subjected to installation stresses and environmental loads.

2. Service life of undamaged pipe can be prolonged by the reduction of operating pressure(s)....

3. Service life of already damaged pipe is unlikely to be significantly prolonged by reduction of operating pressure and will continue to show a high failure regardless of any ameliorative measures.

4. The present program of piecemeal repair is not having the desired effect of diminishing gas losses or improving continuity of service, and is consequently an expensive program which is not satisfying the needs of subscribers to the service.

5. A risk of personal injury and property damage is created by the leakage condition. Sooner or later, this risk is likely to result in an accident involving repair crews or bystanders. (citation omitted).

The report included the recommendation that a phased program of replacement of pipe be planned, tap by tap, commencing as soon as feasible.

## THE UNDERLYING CLAIMS

A complex series of Canadian lawsuits against Dow Canada and others ensued. Thirteen of the actions were filed by individual co-ops. In 1984 the Province of Alberta sued "in subrogation" on behalf of 25 additional co-ops. The claims asserted against Dow Canada were for approximately $30 mil-

lion (Canadian) which included $27 million (Canadian) for replacement of PE3306. Eventually, in November, 1990, Dow and Dow Canada settled all of the suits with the Province of Alberta and the individual co-ops. The terms of the settlement are complex.[2] The bottom line is that the settlement cost Dow and Dow Canada a net cost in United States money of $8.3 million.

## THE EVOLUTION OF THIS SUIT

When this action was commenced in 1985 by Fireman's Fund, it was a declaratory judgment action. Dow Canada counterclaimed. The pressing issue at that time involved estoppel of the primary insurer to raise policy defenses. After the estoppel issue was resolved by rulings on cross motions for summary judgment, this case was put on the back-burner pending resolution in Canada of the underlying claims, and pending resolution in this Court of the issue-related complex Sarabond insurance litigation.

On April 30, 1992, Dow Canada filed an amended counterclaim joining the London Insurers and seeking a money judgment of indemnity against its primary and excess insurers for the net cost of its settlement of the Canadian litigation.

## THE PENDING MOTIONS

The amended counterclaim was filed pursuant to a stipulation by all of the parties, including the excess insurers being added to the suit by the amended counterclaim.

The stipulation provided that parties could file cross motions for summary judgment with respect to the number of occurrences issue "under policies issued by the counter-defendants effective during the latter half of the calendar year 1974" and that answers to the counterclaim would be postponed until after the Court ruled on the motions.[3] Discovery is held in abeyance pending the Court's ruling.

---

2. The record suggests that one Canadian lawsuit by an extruder against Dow Canada is not yet resolved.

3. The insurance policies described herein encompassed or overlapped the period from June 11, 1972 to June 11, 1975.

It appears from the briefs and oral argument that this unusual procedure was agreed upon for the following reasons: (1) resolution of the number of occurrences issue is a key element in settlement negotiations, (2) voluminous relevant discovery in the underlying Alberta pipeline litigation is available to the parties and (3) the parties and the Court have dealt with the number of occurrences issue extensively under the applicable insurance policies in a number of complex factual situations in related Sarabond litigation. *Déjà vu!*

Dow Canada filed a motion for summary judgment against Fireman's Fund and London Insurers claiming that there was but one occurrence in connection with the Alberta pipeline claims. London Insurers filed a motion for summary judgment against Dow Canada arguing that the property damage to each co-op's pipeline system arose out of separate occurrences. Fireman's Fund elected not to file a motion or substantive brief concerning the number of occurrences issue, but at oral argument in response to an inquiry by the Court, stated that it would not be dissatisfied with a ruling that all of the claims arose out of one occurrence.

## THE INSURANCE POLICIES

Dow Canada was protected from property damage liability during the latter half of 1974 by four insurance policies: (1) a primary insurance policy, (2) an excess insurance policy, (3) an umbrella policy, and (4) the Canadian policy.

### (1) The Primary Insurance Policy

Policy No. L 207 5500 was issued by the American Insurance Company (Fireman's Fund) effective January 1, 1974. It was cancelled effective April 1, 1976. This policy was a manuscript comprehensive general liability insurance policy providing $2.5 million per occurrence protection to Dow and to each of its subsidiaries, including Dow Canada, subject to a $150,000 deductible. The policy provides that Fireman's Fund will pay all sums which Dow becomes legally obligated to pay as damages because of property damage,

to which the insurance applies, caused by an occurrence.

The policy defines an occurrence as an event, including continuous or repeated exposure to conditions which results, during the policy period, in personal injury or property damage not intended from the standpoint of the insured.

The policy also provides that for the purpose of determining the limit of the company's liability, all personal injury and property damage arising out of the repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.[4]

### (2) The Excess Insurance Policy

Policy K25298 issued by several subscribing London Insurers provides indemnity coverage to Dow and Dow subsidiaries, including Dow Canada, for ultimate net loss which an insured corporation may sustain by reason of liability imposed upon an insured corporation by law, or assumed by an insured corporation under contract for damages on account of property damage "arising out of the hazards covered by and as defined in the Underlying Umbrella Policy issued by the Home Insurance Company." The term of Policy K25298 was from June 11, 1972 to June 11, 1975. By operation of the policy definition of ultimate net loss, it provides insurance coverage to Dow and Dow Canada in excess of the $1 million per occurrence umbrella policy and the $2.5 million primary policy. The limits of this policy are $8 million per occurrence.

### (3) The Umbrella Policy

Sandwiched between the primary policy and the excess policy was Policy No. HEC 4345068 issued by Home Insurance Company effective from June 11, 1972 to June 11, 1975. This policy provided Dow, including Dow Canada, with $1 million umbrella coverage which came into play above the $2.5 million primary policy and below the $8 million excess coverage. The $1 million limitation applied to each occurrence and to each annual

---

4. The precise relevant language of this policy, including the insurance agreement and the definition of property damage, is set forth in *Dow Chemical Co. v. Associated Indemnity Corp.*, 724 F.Supp. 474 addendum B at 488 (E.D.Mich. 1989).

period. Dow Canada does not assert a claim against Home Insurance Company in this suit because Home's limits of liability thereunder were exhausted by other claims. The language of this umbrella policy is significant, however, because it contained the following "broad as primary" endorsement:

[I]n the event of loss for which the Insured has coverage under (its) underlying insurance ..., the excess of which would be recoverable hereunder except for terms and conditions of this policy which are not consistent with the underlying, then notwithstanding anything contained herein to the contrary this policy shall be amended to follow the terms and conditions of the applicable underlying insurance with respect to such loss.

### (4) The Canadian Policy

On or about January 1, 1964, Dow Canada and The American Insurance Company entered into an insurance contract for a one-year period which was renewed annually. The contract was cancelled April 1, 1986. This policy is referred to as a "fronting" policy. Dow Canada does not rely on it for indemnification, and its policy language, if not its very existence, can be disregarded.

## UNIFIED POLICY CONSTRUCTION

The umbrella and excess policies contain their own definitions of occurrence, but it is unnecessary to examine the definitions. The excess policy follows the form of the umbrella policy and the umbrella policy states that its coverage is as broad as the primary policy. The definition of occurrence construed in the context of the primary policy controls the number of occurrence issue with respect to all parties under all policies. See *Dow v. Associated Indemn.*, 724 F.Supp. at 480.[5]

## THE POSITIONS OF THE PARTIES

### Dow Canada's Position

Dow Canada's position in their briefs is that the underlying claims result from a sin-

gle cause, the manufacture and sale of an intrinsically harmful product, Dow Canada N5303 resin and, therefore, comprise a single occurrence. Dow Canada concedes that problems in the production and delivery process, such as excessive moisture and foreign material in the compounded resin and the inclusion of off-spec material in the compounding process, contributed to defectiveness in some of the PE3306 pipe. Dow Canada relies on the fact that discovery and correction of these specific causes of damage did not eliminate the necessity of replacement of all of the pipe made with its N5303. Dow Canada argues that all of the pipe compounded from Dow Canada N5303 resin had a tendency to brittle failure[6] and that this characteristic of its product was the overarching cause of all of the property damage.

During oral argument, in response to inquiry by the Court, Dow Canada conceded that it *might* be appropriate for the Court to determine that there was more than one occurrence, but that the event or continuing exposure to conditions which made necessary the replacement of all PE3306 was but one occurrence.

### The London Insurers' Position

London Insurers' position was summarized in its reply brief as follows:

"[T]he property damage to each co-operative's pipeline system should be deemed a separate occurrence based upon the following *undisputed* facts:

1. Dow's resins, like Sarabond, were a component of an end product, the properties of which differed because of variables in the compounding and extruding processes;

2. The end product was installed in different systems of varying design by different entities in differing terrain resulting in

---

5. Even if the umbrella policy and the excess policy did not contain their "broad as primary" and "following form" language it would be appropriate, if possible, for the policies to be construed so that they are consistent with each other. Otherwise, the insured's reasonable expecta-

tion of having a meaningful and coordinated insurance program in place might be frustrated.

6. "Brittle failure" is a term of art which distinguishes cracks which developed in a certain manner.

its being subjected to different operating pressures and environmental forces;

3. Some of the pipe extruded from Dow's resins performed satisfactorily; some of the pipe leaked due to many different causes;

4. The government decided to replace the pipe, not because the resins were "intrinsically harmful," but because a newly developed test revealed that the pipe's projected useful life property was not as long as the government wanted; and

5. Dow's resins may have heightened the potential for brittleness, like Sarabond undoubtedly heightened the potential for accelerated corrosion, but no property damage occurred in the absence of other causal factors."

London Insurers' Reply Brief—1–2 (emphasis added).

The London Insurers' oral argument was more succinct. They argued that most of the replaced pipe was not damaged. They further argued that because the damage to each Sarabond building was a separate occurrence, each co-op's damage should be deemed to result from a separate occurrence.

## RELATED LITIGATION

This case is related to *Dow Chemical Co. v. Associated Indemnity Corporation, et al.,* File No. 85–CV–10037, herein referred to as the Sarabond case. Dow Canada and the London Insurers each urge the Court to follow its Sarabond number of occurrences rulings in deciding the pending motions.[7]

The cases do have several common characteristics. The parties in this case were all parties in the Sarabond case. The primary, umbrella and excess policies in this case were involved in and were interpreted in the Sarabond case. Each case includes a claim by Dow (or Dow Canada) for indemnity from a

primary insurer (Fireman's Fund) and from several excess insurers for losses resulting from products liability property damage claims. In each case Dow (or Dow Canada) is seeking indemnity for settled claims as distinguished from final judgments, and there has been no adjudication between Dow (or Dow Canada) and the underlying claimants as to the cause or causes of the property damage for which damages were sought by the underlying claimant. Ironically, each case involves the development of cracks in a substance made with a product produced and sold by Dow or Dow Canada.

The cases have dissimilarities as well.

In the Sarabond case only a fraction of the facades made with Dow's product required repair or replacement. In Dow Canada the replacement rate of the pipelines was one hundred percent. In Sarabond, the failure of the facades built with Sarabond mortar depended upon the manner in which the product was used. In the Sarabond case Dow was more than a mere supplier. By acts and omissions, which varied from building to building, Dow influenced the manner in which Dow's product was used.

In this case, the damage to the co-ops' pipeline systems, no matter how that damage is defined, was not caused by Dow Canada's conduct after delivery of its resins.

## THE COURT'S SARABOND OPINIONS

Although the Court filed several substantive opinions in the Sarabond case and in other related litigation, only two District court opinions were published.[8]

One of them, *Dow Chemical Co. v. Associated Indem. Corp.,* 724 F.Supp. 474 (E.D.Mich.1989), dealt with the trigger of coverage issue. Following the lead of the parties, this case is referred to herein as *Dow I.* The nature of the property damage

---

**7.** The Sarabond litigation involved hundreds of buildings. The combined cost of settlements and defending claims exceeded $200 million. The litigated issues included determination of number of occurrences, determination of the trigger of coverage, applicability of policy exclusions, recoupment by the primary insurer of costs advanced for defending claims which were determined not to have been triggered during the

primary policy term, and issues involving prejudgment interest. It remains to be seen how many of these issues will be revisited.

**8.** A Sixth Circuit Court of Appeals decision concerning reinstatement premiums was also published. *Associated Indemnity Corp. v. Dow Chemical Co.,* 935 F.2d 800 (6th Cir.1991).

in the Sarabond case was developed in *Dow I* and need not be repeated here. The basic ruling in *Dow I* was that coverage was triggered by "injury in fact."[9]

The other published case, *Dow Chemical Co. v. Associated Indem. Corp.,* 727 F.Supp. 1524 (E.D.Mich.1989), dealt with the number of occurrences issue and is referred to herein as *Dow II.* In *Dow II* the Court granted Dow's motion that each building in a claim or suit was a separate occurrence, subject to separate deductibles or retentions and limits of coverage. The Court denied Fireman's Fund's motion for reconsideration of *Dow II.* In a series of written opinions, the Court applied the rule of *Dow II* to a number of specific Sarabond claims. Because of the parties' reliance thereon, *Dow II,* the order denying the motion for its reconsideration and some of the Court's opinions concerning specific Sarabond buildings will be summarized herein.

## DOW II AND DENIAL OF THE MOTION TO RECONSIDER

It was Fireman's Fund, the primary insurer, that filed the motion for reconsideration of the Court's ruling in *Dow II.* The motion for reconsideration was successfully opposed by each of the adversaries on the motion now under consideration.

In *Dow II* the Court observed that the leading "single occurrence" products liability cases have a common characteristic: the insured's product was defective in a way which was the single proximate, uninterrupted and continuous cause of the property damage. The Court assigned the labels "intrinsically harmful" or "intrinsically defective" to such a product. The Court ruled that Sarabond was not an intrinsically harmful product and that the property damage to each building was attributable to a separate occurrence.

In the order denying the motion for reconsideration, the Court adopted the following language from the excess insurers' brief:

Although Sarabond claims have identifiable common issues, every Sarabond building is unique. Dow sold Sarabond for individual buildings which had unique design and construction characteristics, *and Dow's role in the design and construction processes of those buildings also varied.* The environment to which Sarabond was subjected varied depending upon the location in which it was used and the construction detail.

*Dow [allegedly] concealed information [from] customers separately and in varying degrees depending upon when the sales took place and upon the extent to which Dow was involved in the design and construction processes.* The damage for which Sarabond plaintiffs sued resulted from various factors, including the surrounding environment and weather conditions, the design of the buildings, workmanship, and the like. (citation omitted) (emphasis added).

## THE MERRILL TRUST BUILDING OPINION

The Merrill Trust Company Building involved a unique situation because the same property was damaged in different ways.

Construction of the Merrill Trust Company Building commenced in 1974. As was typical of the buildings in the Sarabond case, the building was covered with a facade of brick panels fastened together with mortar which included Sarabond. The owner took possession of the building in August, 1976. In the fall of 1976, the building leaked. A major cause of the leaking was unrelated to the mortar, but there was evidence that inad-

---

**9.** Determination of the dates on which coverage was triggered with respect to each of the hundreds of buildings necessarily involved fact finding. Following a testimonial hearing supplemental to a motion for summary judgment, the Court adopted a formula for determination of the date "injury in fact" occurred. The formula required fact finding with respect to three ingredients with respect to each building: (1) date of construction (2) date of actual manifestation of cracks and (3) the size of cracks upon actual manifestation. The factual issues for application of the formula to each building were submitted to the Court for fact finding on stipulated records. In this way, jury trials which might have taken several years to try were avoided. After years of intense litigation, final judgment was entered in the Sarabond case on September 18, 1992. Appeals of some issues are pending.

equate bonding between the mortar and brick contributed to the leaking.

Corrective measures were taken. The leaking problem appeared to be solved by 1980, but there was some evidence that by 1985 some leaking from the original causes was beginning to reoccur.

Four years after the leaking was discovered, the building suffered a substantial facade failure which was caused by corrosion-induced cracking. The Court ruled that the connection between the 1976 leaking and the facade failure some years later was too tenuous to protect Dow from a ruling that, as a matter of law, there were two legally distinct occurrences.[10]

## OPINIONS INVOLVING THE APPLICATION OF DOW II TO OTHER SPECIFIC BUILDINGS

One opinion involved the construction over a period of years of seven buildings on one college campus. Another opinion involved a series of additions or wings to an existing hospital. Each building or addition had facade damage due to corrosion induced cracking. The Court reiterated the principal that all property damage which results from one proximate, uninterrupted, and continuing cause is one occurrence. The damage to the seven buildings on one campus was determined to result from four occurrences. Damage to multiple additions to the hospital was determined to result from three occurrences. These rulings have little significance in this case. Here Dow Canada asserts that its product was intrinsically harmful. No party made that assertion concerning Sarabond. Furthermore, in the Sarabond cases there were outcome determinative allegations concerning Dow's participation in the design and construction processes and there were outcome determinative allegations against Dow of misrepresentation, including allegations of fraudulent concealment.[11]

The specific opinions involving the application of *Dow II* did establish that whether the underlying plaintiff lumped damage to several structures in one suit and whether they were settled in one lump sum was irrelevant to the number of occurrences issue.[12]

## THE COURT'S ANALYSIS

■ Some principles for determining the number of occurrences with respect to a claim or claims are established:

(1) The number of occurrences is determined by reference to the cause or causes of the damage rather than by reference to the number of claims or settlements.

(2) All property damage which results from one, proximate, uninterrupted, and continuing cause stems from a single occurrence.

(3) If the continuous production and sale of an intrinsically harmful product results in similar kinds of property damage, then all such property damage results from a common occurrence.

The third principle is a guideline for the application of the second.

## IDENTIFYING PROPERTY DAMAGE GENERALLY

Property damage is defined in the primary policy as follows:

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom; or (2) loss of use of

---

10. The real bone of contention with respect to *Merrill Trust* involved the "trigger" issue. The cost of repairing the leaking was relatively small. The cost of replacing the facade was very large. It may be assumed that most of the multi-million dollar settlement was apportioned to the second occurrence. Had the Court ruled that there was but one occurrence, the entire loss would have been triggered in 1976. This would have been to Dow's advantage. It was eventually determined that the injury-in-fact date of the second occurrence was in 1980, although damage was not manifested until 1983.

11. In one case against Dow that went to trial, the jury actually returned a large verdict against Dow that included several millions of dollars of punitive damages. This case was settled pending appeal.

12. In the few situations in which one settlement involved multiple occurrences, the parties were able to negotiate an allocation of the settlement to the different occurrences.

tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

To identify property damage two questions must be answered. What property was damaged? What is the nature of the damage?

■ For the purpose of determining the initial duty to defend, it is necessary to look to the property damage described in the underlying complaint.

■ For the purpose of determining the duty to indemnify, a narrower focus may be appropriate.

If an underlying claim is resolved by adjudication, the court record may be of assistance in identifying the property damage which was found to have occurred.

If an underlying claim was settled without an adjudication, the relevant property damage in the insurance litigation is the property damage which was seriously assumed by the settling parties to have been potentially provable by the underlying claimants in suits against the insured.[13]

In actual fact, there may have been no property damage. The realistic possibility, however, that the existence of property damage could be proven in an underlying suit is a necessary element of any reasonable settlement that is more than a mere nuisance settlement.

■ If a settlement is negotiated upon the assumption that damage to particular property was potentially provable by the underlying claimant, then the fact that there was damage to that property becomes the law of the case in the coverage litigation. Furthermore, if the settlement is based upon the assumption that property damage of a particular kind and dimension was potentially provable, then the fact that there was property damage of that particular kind and dimension becomes the law of the case. A liability insurer cannot defend a coverage issue by attacking the credibility of evidence that such property damage occurred.

## IDENTIFYING THE PROPERTY DAMAGE IN THIS CASE

The following categories of property were damaged:

1. Pipe that was destroyed and discarded prior to and during installation.

2. Installed pipe that was replaced and discarded when repairs were made.

3. All pipe in the ground when the replacement programs were undertaken.

4. All unused pipe.

5. All escaped gas.

■ The London Insurers argue that there was no property damage to pipe which had not developed leaks. This argument is fallacious. The issue is not whether there was physical alteration of the pipe. The issue is whether the pipe was defective when it was formed. The Rice Report states that it was. For the purpose of determining coverage issues, this conclusion in the report is the law of the case.

The London Insurers also seem to argue that there was no property damage because the PE3306 pipe was replaced with better pipe. This is like arguing that there is no damage when a single pane of glass is broken if it is replaced with double pane glass.

The nature of the damage to the PE3306 pipe is easy to describe. *All* of the pipe had an unacceptable propensity to develop leaks after installation and when subjected to continuous internal operating pressure. Some of the pipe may have had an even greater propensity to break or develop leaks during or soon after installation.

## IDENTIFYING THE CAUSES OF PROPERTY DAMAGE GENERALLY

■ In the complex industrial world there are very few situations in which there are not multiple causes of property damage. In identifying the causes of property damage for the purpose of determining the number of occurrences, the causes of the property dam-

---

**13.** In the order denying motion for reconsideration of *Dow II,* the Court stated that the duty to indemnify is based upon the result-determinative characteristics of the underlying claims.

age must be determined from the insured's point of view. The issue is determined by reference only to those "causes" for which the insured may have shared some responsibility.

If different parties were sued by the same claimant for the same damage to the same property, and if each party was insured under comprehensive general liability insurance policies issued by the same insurer with the same policy language, there might be a different number of occurrences under each policy.

## IDENTIFYING THE CAUSES OF PROPERTY DAMAGE IN THIS CASE

Dow Canada did not manufacture pipe nor did it design or install pipeline systems.

Claims were asserted against Dow Canada because it made, sold and delivered resin.

The possibility that the property damage in this case may have been caused or aggravated by or during the process of extruding, storing, delivering or installing pipe, because of pipeline design or because of environmental conditions is totally irrelevant to the issue before the Court.

All of the resin sold by Dow Canada was intrinsically harmful because there was an unexplained property or characteristic of N5303 such that all pipe extruded from it, by whatever method, was deficient for use in the rural gasification program. The multimillion dollar settlement reflected an assumption by the negotiating parties that there was a realistic possibility that this fact could be proven in the underlying lawsuits.

Some of the resin may also have been intrinsically harmful because of attributes resulting from discovered flaws in the production process for which Dow Canada may have been responsible. Does this require a ruling by the Court that for every product defect there was a separate occurrence? [14]

■ The purpose of insurance is to insure. An insured is not entitled to coverage when its claim for coverage is inconsistent with the policy terms. An insured is entitled to a reasonable interpretation of its policy to minimize the cost of coverage litigation.

In the opinion establishing a formula for determining the date of "injury in fact" in the Sarabond claims, the Court stated that "reality ... must include a construction of the contract which enables the claims-administration process, and the judicial process if litigation develops, to ascertain (coverage issues) in some reasonably efficient manner."

■ In this case most of the damage was directly attributable to the overarching cause. Furthermore, it would be virtually impossible to sort out the damage, if any, which was solely attributable to other causes for which the insured was responsible.

The production of defective resin was the sole, proximate, uninterrupted, and continuing cause of all of the property damage in the case for which Dow Canada could be responsible.

There is absolutely no basis on the record before the Court to rule that the damage to each co-op stemmed from a separate occurrence.

## CONCLUSION

It is the opinion of the Court that all of the property damage sustained by the several co-ops and by the Province of Alberta was directly attributable to one occurrence. Accordingly, an order granting Dow Canada's motion for partial summary judgment and denying the London Insurers' motion will be entered.

---

14. Although Dow Canada acknowledged this possibility, no party has asked the Court to so rule.