OPINION OF THE COURT
Harold Baer, Jr., J.
This declaratory judgment action involves a dispute between two insurance companies over their respective obligations to pay the cost of a settlement in a personal injury action. The court denied a motion for summary judgment by the defendant. A trial was held and the court must now decide upon and declare the obligations of the parties.
On March 5, 1981, the car of Norman Unger skidded during a snowstorm and hit William Mara, a dentist in his early 30’s. The accident cost Dr. Mara a leg. Unger was an employee of the State Insurance Fund of the State of New York (SIF) and was returning in his own automobile from a hearing that he had attended on behalf of the SIF. Unger had insurance on his automobile with Allstate Insurance Company (Allstate) for a maximum of $50,000. At the time of the accident, the State of New York had insurance with plaintiff, Merchants Mutual Insurance Company (MM). The insurance consisted of (a) business automobile coverage providing bodily injury liability insurance in the amount of $100,000/$300,000; and (b) excess automobile coverage providing bodily injury coverage of $900,000 over $100,000 of primary coverage, for a maximum of $1 million.
Dr. Mara and his wife sued Mr. Unger in this court for the injuries suffered in the accident. On May 22, 1981, Dr. Mara and his wife caused to be filed a notice of intention to file a claim. The notice named as defendants the SIF, the State of *3 New York, and the New York State Department of Transportation.
The Mara lawsuit proceeded. Mr. Unger was represented by counsel provided by Allstate. In early 1984, the lawsuit was settled. Allstate paid the plaintiffs $50,000 and MM agreed to pay them $1 million. Counsel for MM, present at the settlement conference, stated on the record that MM was settling the matter on behalf of its insured, the SIF and the State of New York, and was not insuring or representing Mr. Unger. Counsel stated further that MM was acting to obtain a cap on the monetary aspects of the case without the risk of a jury verdict and to resolve the matter in one forum rather than have the plaintiff commence a suit in another forum, and counsel referred to the notice of intention to file a claim that had previously been filed. Counsel went on to remark that MM had tried to get defendant The Hartford Insurance Group (Hartford) to participate in the settlement and appear at the conference but Hartford had declined. MM paid Dr. Mara and his wife $1 million and the Maras gave a release to the State and MM.
MM then instituted this action against Hartford. The basis for counsel’s remarks at the settlement conference and for this action is an "umbrella” policy issued by Hartford and covering the SIF for $5 million, a policy that was in effect at the time of the accident. In the complaint herein, MM seeks a declaration of the respective obligations óf MM and Hartford with regard to the $1 million paid to the Maras. MM claims that, under the policy, Hartford insured Unger, the State and/ or the SIF and that this coverage was primary to and/or concurrent with MM’s coverage. Hartford is alleged to have breached its duty to deal in good faith and to negotiate a settlement in the Mara case and is liable to MM therefore. MM also asserts that it became the equitable assignee and/or subrogee of Unger’s rights upon payment of the Mara settlement.
Hartford argues that since MM did not cover Unger, the payment by MM of $1 million was the act of a volunteer. But MM would not have been a volunteer had the settlement been made in a reasonable effort to avoid the risk that a substantial judgment might eventually be obtained in favor of the young dentist and against the SIF. Clearly, the amount of the settlement was not unreasonable given the doctor’s injuries, age and profession. Hartford, however, argues that MM could *4 not have been exposed to an obligation to pay because the Maras could not have pursued a claim against the SIF.
The notice of intention to file a claim was followed by inactivity. The filing extended the Maras’ time to file a claim for two years but no claim was ever filed. The settlement occurred 10 months after the two-year period had expired. The Maras still had time within which to move for an extension of time to file the claim, even though it is problematic whether on the facts the Maras would have obtained permission. Nonetheless, a claim against the SIF and the State was still viable as of the settlement date. Where a claim has not been filed, a timely notice of intention to file a claim may be treated as the claim itself. Court of Claims Act § 11 provides that a claim must set forth "the time when and place where such claim arose, the nature of same, and the items of damage or injuries claimed to have been sustained and the total sum claimed.” Here the notice, which was served on the Attorney-General as required, contained these elements. It stated when the accident occurred, the point on the Bronx River Parkway where it occurred, the injury to Dr. Mara, his profession, the amount of damages claimed by Dr. Mara and the amount claimed by his wife as loss of services. It advised that the accident occurred because "Norman R. Unger, while in the course of his employment with the State of New York and State Insurance Fund, carelessly and negligently operated his 1977 Ford * * * causing his vehicle to travel off the roadway and strike the claimant”. Thus, the State was informed of the nature of the negligence claimed and the alleged reason for the State’s responsibility. This is sufficient specificity to serve the purposes of section 11. Abundant detail is not necessary, but rather what is present here — "a statement made with sufficient definiteness to enable the State to be able to investigate the claim promptly and to ascertain its liability under the circumstances * * *. [Substantial compliance with section 11 is what is required”. (Heisler v State of New York, 78 AD2d 767 [4th Dept 1980]; see, Artale v State of New York, 140 AD2d 919 [3d Dept 1988]; Liberty Mut. Ins. Co. v State of New York, 121 AD2d 694 [2d Dept 1986]; Barski v State of New York, 43 AD2d 767 [3d Dept 1973]; Erickson v State of New York, 131 Misc 2d 607 [Ct Cl 1986].)[1] It appears that the notice was not *5 verified as required by section 11, but that lapse ought not to have proved fatal. (Williams v State of New York, 77 Misc 2d 396 [Ct Cl 1974].) Thus, at the time it considered possible settlement, MM had reason to fear a suit against the State or the SIF and its settlement may not be equated with that of a volunteer.
Hartford claims that the requirements of Public Officers Law § 17, which provides for the defense and indemnification of State employees but requires that notice of the initiation of a case be given to the Attorney-General, were not satisfied here. Subdivision (3) (b) states that nothing therein shall be construed to authorize the State to indemnify an employee with respect to a settlement that has not been reviewed and approved by the Attorney-General as provided therein. By letter dated April 29, 1981, Unger requested that the Attorney-General (among others)'see to his defense. Unger may not have given the Attorney-General the required notice within the required five-day period. However, the fact that Unger might have failed to comply fully with section 17 and perhaps lost an opportunity for indemnification does not mean that the Maras could not have settled with Unger and pursued their claims against the State in the Court of Claims on a theory of respondeat superior. It seems clear that Unger was in the scope and course of his employment when the accident occurred. He had driven to White Plains in his own car specifically and solely for the purpose of attending a hearing on behalf of his employer, the SIF. He was being paid a mileage charge therefor. At the completion of the hearing, he was returning to New York City when the accident occurred as he was heading south on the Bronx River Parkway. Mr. Unger’s office and home were located in the city. He may have been intending to go home and to stay there in view of the bad weather, rather than to return to his office. Nevertheless, his journey to White Plains had been undertaken only to serve his employer and his presence on the Bronx River Parkway was the necessary result of this journey. This was not a case of an employee who suffered an accident during his daily automobile commute to and from work. (See, Lundberg v State of New York, 25 NY2d 467 [1969]; Clark v Hoff Bros. Refuse Corp., 72 AD2d 936 [4th Dept 1979].)
I am thus brought to the central issue in this case. Hartford argues that it had no obligation to pay anything below $1 million and that therefore no benefit accrued to it by virtue of MM’s settlement. Hartford argues that the SIF intended to *6 purchase $6 million of auto insurance with $1 million to be taken from MM and $5 million of excess coverage being provided by Hartford’s umbrella policy. The Hartford policy was, counsel contends, clear on this since it specified that it would indemnify the insured "for ultimate net loss in excess of the underlying limit”. Endorsement GH-128 confirmed this, counsel states, since it provided that the policy would be inapplicable to liability not covered by underlying insurance as described in the schedule thereof. That schedule contained a limit of liability of $1 million for bodily injury provided by MM. Hartford claims that its reading of the policies is further confirmed by the fact that the premium for MM’s excess policy was $34,369, whereas the premium for the Hartford policy was $7,200, indicating that Hartford was running a lower risk than MM (despite the fact that the policy was an umbrella one covering different 'types of risks) because the Hartford policy did not "kick in” until the $1 million limit was reached.
MM, on the other hand, claims that the issue of the premium amounts does not help Hartford since MM’s excess policy covered the autos of numerous State agencies and departments; thus, the $34,369 is not out of line with Hartford’s premium. There is, however, an ambiguity in MM’s policy as far as this question is concerned. The MM excess policy identified the insured as "People of the State of New York, Albany, New York” (as did the business auto policy). (Hartford’s policy identified the insured as "The State Insurance Fund, 199 Church Street, New York, New York 10007.”) This would seem to support MM’s point. Endorsement B/C 0064 of the MM excess policy, however, stated that "[i]t is hereby understood and agreed that under Item 5 — Limits of Liability, for State Insurance Fund the following applies” (emphasis added), and there followed the $1 million limit. This appears to indicate that the policy covered the SIF only. There are no other endorsements identifying coverage limits for other agencies and departments and item 5 says only "See endorsements attached.” No other evidence exists in the record to indicate that all other State autos were covered and, furthermore, there is nothing to identify what the limits on liability might have been with respect to those cars. To find limits for such other cars one would need to apply endorsement B/C 0064 to those cars despite the language referring only to the SIF. It cannot be concluded that those limits would apply to the SIF but that coverage would be provided to other *7 State agencies or departments without limit. Beyond the simple unlikelihood of such an unbusinesslike arrangement, the excess policy provides that MM would indemnify the insured against loss subject to the limits stated in item 5 but that the policy would apply "only to coverages for which an amount is indicated in Item 5, Section 1 and then only in excess of the corresponding amount as indicated in Item 5, Section 11”.
The Hartford policy states that it provides insurance "for ultimate net loss in excess of the underlying limit.” The definition section defines "underlying limit” to mean "the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies.” Endorsement GH-128 does indeed confirm this, as Hartford argues. There is, however, a possible ambiguity here too. The schedule states that the limit for liability with respect to MM will be $1 million for bodily injury. This is in accord with Hartford’s argument. But the only MM policy number on the schedule is that of a business auto policy,[2] which provided bodily injury coverage of only $100,000/$300,000. The policy number of the excess policy does not appear. What is the court to make of this inconsistency in the schedule? The choices are either to give greater weight to the policy limit listed therein than to the policy number identified, or to decide that the limits to be applied are those contained in that policy despite the higher numbers .actually listed in the schedule. The court concludes that the "underlying limit” was $1 million. The very purpose of the schedule was to list the limits above which Hartford intended to provide coverage. The limit clearly listed was $1 million. That in fact was the limit for MM auto coverage. The schedule also listed a limit of $100,000 for property damage as covered by MM. This number too is the limit provided by MM’s excess policy, not the business auto policy. (The business auto policy provided only $10,000 of such coverage.) Further, the schedule describes the type of MM policy as "comp auto liab.” No evidence has been presented as to the meaning of this term. Absent other indications, it appears to this court that this term is more likely to refer to the comprehensive coverage provided by the MM excess policy than the rather *8 skeletal coverage furnished by the business auto policy. The critical objective of Hartford in completing the schedule was to define the amount of the underlying coverage. Its selection of the maximum actually provided by MM should control over the misdesignation of the policy number.
In addition, it appears to this court that Hartford should not shoulder the entire blame for the failure to include the number of the MM excess policy on the schedule. The SIF agreed that "the statements in the declarations are its agreements and representations [and] that this policy is issued and continued in reliance upon the truth of such representations”. This suggests to the court that Hartford relied upon the SIF to identify the policies by which it was covered and that the SIF gave Hartford inaccurate information as to the relevant policy numbers.
MM’s major argument is that this case presents a duel between the clash of "other insurance” clauses and that, under the rule of Lumbermens Mut. Cas. Co. v Allstate Ins. Co. (51 NY2d 651 [1980]), Hartford should be obliged to contribute ratably to the settlement. The general rule, the Court of Appeals there stated, is "that where there are multiple policies covering the same risk, and each generally purports to be excess to the other, the excess coverage clauses are held to cancel out each other and each insurer contributes in proportion to its limit amount of insurance”. (51 NY2d, supra, at 655.) The MM excess policy provided with regard to insurance other than primary insurance that MM’s policy "shall be excess over any other valid and collectible insurance available to the Insured.” Hartford’s policy provided: "The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the insured, whether or not described in the Schedule of Underlying Insurance Policies, and applicable to any part of ultimate net loss, whether such other insurance is stated to be primary, contributing, excess or contingent; provided that if such other insurance provides indemnity only in excess of a stated amount of liability per occurrence, the insurance afforded by this policy shall contribute therewith with respect to such part of ultimate net loss as is covered hereunder, but the company shall not be liable for a greater proportion of such loss than the amount which should have been payable under this policy bears to the sum of said amount and the amounts which would have been payable *9 under each such other excess indemnity policy applicable to such loss had each such policy been the only policy so applicable”. MM contends that because Hartford’s policy did not purport absolutely to preclude contribution and to be excess to all other policies, Hartford must contribute.
The court does not agree. The Hartford policy did not come into play until the "underlying limit” of $1 million was reached. MM’s excess policy, on the other hand, came into play when the primary limit of $100,000 had been exceeded. Hartford’s insurance would not fall within the bounds of MM’s "other insurance” clause since the Hartford insurance was not "collectible” with respect to a $1 million settlement. Similarly, the Hartford clause provided for contribution where there was other insurance "in excess of a stated amount of liability per occurrence,” but contribution was to be made only "with respect to such part of ultimate net loss as is covered hereunder. ” (Emphasis added.) A $1 million loss was to be covered by MM, not by Hartford.
Lumbermens (supra) is not to the contrary. The Court of Appeals stated that the general rule was inapplicable to that case "because its use would effectively deny and clearly distort the plain meaning of the terms of the policies of insurance here involved.” (51 NY2d, supra, at 655.) There, a second policy that insured the driver’s mother provided coverage for the driver. This policy stated that its insurance for a non-owned vehicle " 'shall be excess insurance over any other collectible insurance’ ” (supra, at 654), language similar to that found in the MM policy. A third policy provided that the carrier would pay the net loss in excess of the insured’s " 'retained limit’ ” (supra, at 654), which was defined as the sum of the applicable limits of underlying policies listed on a schedule and any other collectible underlying insurance. The policy issued to the driver’s mother was listed on the schedule. The court concluded that the second policy would have to be exhausted before the third came into play because the third was designed specifically to provide coverage in excess of that provided by the mother’s policy, as shown by the schedule. The parties bargained for this, not for contribution. Here, as in Lumbermens, the Hartford policy included the MM coverage on its schedule of underlying coverage and expressly provided for coverage only in excess of that. Although the actual policy number is not listed in the schedule, in apparent contrast with Lumbermens, the amount, type of coverage and the name of the insurer are and that is sufficient. The inten *10 tian clearly was that the Hartford policy was to provide umbrella coverage over and above the MM coverage.
The court is strengthened in its conclusion by reflection on what was done here in the purchasing of the insurance. In Lumbermens (supra) and other cases, the duel between excess coverages came about as a result of accidents in which the insured were covered by policies that had been issued to different persons. The clash of policies was accidental. Here the two policies were purchased by the SIF (or the State on its behalf). It is to be assumed that the SIF, which is itself a part of the insurance universe, would have intended to act reasonably and logically in obtaining coverage. Coverage by both MM and Hartford for liability between $100,000 and $1 million would have been duplicative. The SIF needed to obtain only the MM coverage for that amount and this is what was done. The coverage obtained from Hartford was to be umbrella coverage. (8A Appleman, Insurance Law and Practice § 4909.85 [1981].) It was intended to become applicable only after the $1 million insurance provided by MM was exhausted and thus was to provide security against higher losses. Whereas exposure on the MM excess policy ended at $1 million, the Hartford coverage was for $5 million. The umbrella policy also insured against other risks, such as general liability and professional liability, and here too liability was to attach only in excess of stated coverage obtained elsewhere. The MM policy provided neither for high coverage nor for coverage against other kinds of risks. There is every reason to believe that the SIF did not intend to place the Hartford coverage on the same plane with the excess coverage supplied by MM. A contrary conclusion would signify that the SIF had acted irrationally.
The court concludes that Hartford had no obligation to contribute to the settlement in the Mara case and that Hartford did not breach a fiduciary obligation to participate therein. Since Hartford owed nothing on its policy at or below that amount, it cannot be liable to MM on a theory of equitable subrogation.

. The court has some doubt whether the notice provided enough detail insofar as it purported to claim that the State and the State Department of Transportation negligently designed, maintained and controlled the roadway, but it is not necessary to decide this point.

. The number listed is that of the first 10 digits of the policy number of exhibit 21. The last three digits on the schedule are different from this number. This appears to be an earlier version of the MM business auto policy.