[709 NYS2d 24]

In the Matter of the Liquidation of MIDLAND INSURANCE COMPANY. LAC D'AMIANTE DU QUEBEC, LTEE. (ASARCO), Appellant-Respondent; SUPERINTENDENT OF INSURANCE OF THE STATE OF NEW YORK, as Liquidator of Midland Insurance Company, Respondent-Appellant.

First Department, June 1, 2000

### APPEARANCES OF COUNSEL

*Allan Young* and *Dennis B. Auerbach* of counsel (*Howard Schwartz* and *John G. Buchanan, III,* on the brief; *Porzio, Bromberg & Newman, P. C.,* New York City, and *Covington & Burling,* Washington, D.C., attorneys), for appellant-respondent.

*David B. Hamm* of counsel, New York City (*Herbert Rubin* and *Herbert Lazar* on the brief; *Herzfel & Rubin, P. C.,* attorneys), for respondent-appellant.

### OPINION OF THE COURT

WALLACH, J. P.

This appeal requires us to determine important issues of insurance law which arise in the context of a liquidation proceeding under the supervision of respondent Superintendent of Insurance. Among the questions presented are a determination

as to when insurance coverage attaches (triggers) with respect to a policy covering "exposure" to asbestos-related risks; the effect, whether binding or otherwise, of a New Jersey Federal District Court decision on the outcome here; and the construction and effect of "Other Insurance" clauses in both the Midland and other policies coextensive with Midland Insurance Company's excess coverage during certain relevant time periods. The claimant (LAQ), here asserting the broadest possible Midland coverage, is a mining, manufacturing and distributing company. Opposing these arguments, on behalf of other claimants and creditors against Midland's assets, is respondent Superintendent.

The matter comes to this Court on an agreed statement of facts, pertinent of which are as follows. LAQ is a Delaware corporation which, until the cessation of operations in 1986, engaged in the mining, milling and selling of asbestos fiber in Quebec, Canada. It is a wholly owned subsidiary of ASARCO, a New Jersey corporation headquartered in New York.

From 1954 through 1962 ASARCO purchased liability insurance, including coverage for product liability hazards, from Employers' Liability Assurance Corporation, with annual policy limits of $50,000. From 1962 through 1976 it purchased similar coverage from Canadian General Insurance Company, with aggregate limits of $100,000 from 1972 to February 1974 and $300,000 to February 1976. Canadian General has entered into a $1.7 million settlement with LAQ for all obligations under policies it issued.

From March 15, 1975 through March 15, 1976, LAQ was also covered by a $3 million umbrella policy issued by American Home Assurance Company (AHAC). For the period from March 15 through April 29, 1975, LAQ purchased an additional $20 million in excess coverage from Highlands Insurance Company. By its terms, the Highlands policy was subject to, and would follow the form of, the underlying AHAC policy. An affidavit from the insurance manager for ASARCO indicates that the Highlands policy was originally intended to be limited to one year, but that Highlands canceled the coverage effective April 29, 1975. Inasmuch as the form policy was not actually generated until May 7, 1975, after coverage had been canceled, the policy actually recited coverage for the period from March 15 to April 29.

For the period from April 29, 1975 through March 15, 1976, LAQ purchased $20 million in excess coverage from Midland. This is the policy at the heart of the disputes on this appeal.

The Midland policy, which also followed the form of the underlying AHAC policy, provided that it was in excess of both the $3 million AHAC coverage and a $500,000 self-insured retention by LAQ.

The underlying AHAC policy, whose form Midland agreed to follow, provides personal injury coverage for an occurrence, which is defined as "an event, including continuous or repeated exposure to conditions, which result in Personal Injury * * * neither expected nor intended from the standpoint of the insured. All such exposure to substantially the same general conditions shall be deemed one occurrence."

The AHAC policy, and consequently, the Midland policy, contained the following "Prior Insurance" clause: "It is agreed, that if any loss is also covered in whole or in part under any other excess policy issued to the insured prior to the inception date hereof, the company's limit of liability * * * shall be reduced by any amounts due the insured on account of any such loss under such prior insurance." Both policies also contained the following "Other Insurance" clause: "If other collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder, this insurance shall be in excess of, and shall not contribute with such other insurance. Excess insurance over the limits of liability expressed in this policy is permitted without prejudice to this insurance and the existence of such insurance shall not reduce any liability under this policy." The Highlands policy contained a similar "Other Insurance" clause.

For the period from March 15, 1976 through March 15, 1977, LAQ procured a $4 million umbrella policy from AHAC in excess of LAQ's million dollar self-insured retention, an additional $20 million in excess coverage from Midland, and still another $10 million in excess coverage from Midland for the period from April 20, 1976 through March 15, 1977.

Between March 15, 1977 and March 15, 1978, LAQ obtained, over a $2.5 million self-insured retention, $3 million in umbrella coverage from AHAC, plus an additional million dollar layer, to which was added a $5 million excess policy from Midland.

Midland drafted its policies, and the parties did not engage in any negotiations regarding the trigger or scope of coverage at the time they were executed.

In the years after 1978, LAQ was insured under other excess AHAC policies, with varying limits of liability beyond the limits

of self-insured retention. Additionally, from 1977 through 1980 ASARCO maintained excess coverage with other underwriters, with annual limits of $10 million. Some of these policies contained asbestos-related exclusions, which the issuing insurers contend exclude coverage for some or all asbestos-related bodily injury claims.

### (1) The New Jersey Litigation

In 1983 LAQ instituted a declaratory judgment action against AHAC, Highlands and Midland, in United States District Court for the District of New Jersey. In construing New Jersey law, that court ruled, in July 1985, that the trigger for coverage was exposure resulting from inhalation, as well as exposure "in residence," i.e., while the asbestos fibers were dormant in the lungs of a particular individual (*Lac D'Amiante du Quebec v American Home Assur. Co.*, 613 F Supp 1549, 1558), citing *Keene Corp. v Insurance Co.* (667 F2d 1034, *cert denied* 455 US 1007), which had adopted the "triple trigger" approach to coverage, viz., exposure by inhalation, exposure while in residence, and actual manifestation of injury. The District Court issued a further order in March 1986, making declarations as to the interpretation and application of the policies with respect to additional issues.

The following month, Midland was placed in liquidation by order of Supreme Court, New York County. In late 1986, Midland moved unsuccessfully for dismissal of the Federal action, and in April 1987 the District Court issued a judgment against Midland in the amount of $6,219,636, as well as judgments against AHAC and Highlands. All three insurers appealed.

On March 4, 1987 the court had also entered an order finding that the indemnity limit of the Highlands policy was $2.5 million, by prorating its $20 million policy limit for the 1½-month period before it was canceled. Highlands settled its obligation to LAQ for $15.5 million, although the settlement appears to have earmarked $2.5 million for indemnity, with the balance for defense costs, interest and attorneys' fees. AHAC also settled with LAQ while the appeal was pending.

Midland contended, among other issues on appeal, that the District Court had adopted an improper interpretation of the policies with respect to the triggering of coverage, as well as the scope of coverage. In December 1988, the United States Court of Appeals for the Third Circuit vacated the judgment against Midland in light of the State liquidation proceeding,

and directed the District Court to dismiss that portion of the action (864 F2d 1033, 1049).

### (2) The New York State Litigation

Shortly after the dismissal against Midland in New Jersey Federal District Court, LAQ timely interposed a claim in the Midland liquidation proceeding in New York. The principal issues which the parties originally stipulated for resolution were:

(a) What factor(s) occurring or existing during the Midland policy period will be deemed sufficient to "trigger" coverage of asbestos-related bodily injuries under Midland's 1975-76 policy?

(b) What is the proper application of the "prior insurance" and "other insurance" clauses appearing in AHAC's 1975-76 policy and, pursuant to the "follow form" provision, in Midland's 1975-76 policy?

We find, however, that the issues on this appeal are more far reaching.

A liquidation Referee recommended, in January 1993, that the court adopt the position of the Superintendent of Insurance that the policy provides coverage for asbestos claims only if the initial injurious inhalation of the asbestos occurred during the policy period, thus rejecting the argument that coverage could also be triggered by subsequent exposure "in residence" (i.e., the point at which—it is later determined—the body became diseased from an earlier ingestion or exposure). In September 1994 the IAS Court adopted the Referee's recommendation in modified form, confirming the finding that coverage was triggered by *initial* exposure, but adding that coverage under the Midland policy was also triggered where the injured party was exposed to asbestos by inhalation at any time during the policy period. Since the Referee made no findings with regard to the "Other" or "Prior" insurance clauses, the court directed that the parties could "submit an agreed statement of facts to this Court, proceed with discovery and resubmit the matter by motion hearing, or refer this matter back to the Referee to make appropriate factual findings."

The Superintendent then sought a declaration that the "Other" and "Prior" insurance clauses in the Midland policy warranted a determination that Midland's obligations were reduced by insurance available under other policies, such as those issued by Highlands, AHAC, Canadian General and Employers' Liability, and particularly by Highlands, which was able to settle for $2.5 million in indemnity payments even though its policy bore a $20 million limit of liability.

In a subsequent decision in March 1998, the court found that the Highlands policy was such an "other" excess policy issued to the insured prior to the inception of the Midland policy, and that since only $2.5 million of the $20 million insurance available under the Highlands policy was paid to LAQ, Midland's exposure should be reduced by $17.5 million.

However, the court also rejected Midland's argument that since it was in liquidation, its insurance was not collectible, and that therefore the obligations under any subsequent policies issued by other insurers with an "other insurance" clause could not be reduced. The court reasoned that the liability claims asserted against LAQ arose before Midland's insolvency, and therefore the latter's obligations were fixed prior to the order of liquidation (Insurance Law § 7405 [b]).

The court additionally found that the Superintendent failed to meet his burden of establishing that the policy limits of certain other policies constituted valid and collectible insurance, as that term is used in the "Other Insurance" clauses contained in the Midland policy, which would serve to reduce further Midland's obligations.

### (3) The Asbestos Risk

At the outset, insurance coverage issues aside, it is clear that asbestosis and related diseases are more complex than other types of personal injury claims under liability policies. The parties themselves have stipulated to the nature of the disease, deeming as accurate the descriptions of asbestosis and mesothelioma in *Borel v Fibreboard Paper Prods. Corp.* (493 F2d 1076, 1083, *cert denied* 419 US 869):

"[I]nhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis. The disease is difficult to diagnose in its early stages because there is a long latent period between initial exposure and apparent effect. This latent period may vary according to individual idiosyncrasy, duration and intensity of exposure, and the type of asbestos used. In some cases, the disease may manifest itself in less than ten years after initial exposure. In general, however, it does not manifest itself until ten to twenty-five or more years after initial exposure. This latent period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional asbestos fibers are inhaled, tissue changes may continue undetected for decades. By the time the disease is diagnosable,

a considerable period of time has elapsed since the date of the injurious exposure. Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.

"A second disease, mesothelioma, is a form of lung cancer caused by exposure to asbestos. It affects the pleural and peritoneal cavities, and there is a similarly long period between initial contact and apparent effect. As with asbestosis, it is difficult to determine which exposure to asbestos dust is responsible for the disease."

There exist at present no medical techniques capable of specifically identifying and quantifying the progression of asbestos-related injury, sickness or disease actually sustained in each year from and after a first exposure to asbestos fiber.

### (4) The Coverage "Trigger"

The IAS Court concluded, and the parties do not dispute, that New York law controls. The issue of what constitutes the trigger point for coverage in cases involving long-term exposure to asbestos is not settled under New York law. The only Court of Appeals decision addressing the issue has done so tangentially. In *Continental Cas. Co. v Rapid-American Corp.* (80 NY2d 640, 650-651), the Court, citing cases from other jurisdictions, noted that coverage could be triggered in four ways, i.e., exposure to asbestos, manifestation of disease, onset of disease, or a combination of the first three. Notably, the Court did not distinguish between initial exposure or continuing exposure.

The issue before the Court of Appeals was whether Continental Casualty Company and Transportation Insurance Company (collectively CNA), which had issued comprehensive general liability policies for the period between 1971 and 1980, could be liable for individuals who displayed manifestations of the disease only after the expiration of the policy period. CNA argued that the insured had conducted its insurance program for years under the theory that the underwriter supplying coverage at the time of the manifestation of the disease was the carrier responsible for coverage. CNA took the position that since it was not on the risk at the time the individuals actually developed asbestosis, it could not be liable. The Court found

that since CNA had agreed to provide coverage for an occurrence, defined similarly in the policies at issue in this case, i.e., continuous or repeated exposure, the injured workers had been exposed by inhalation to asbestos when Continental was on the risk, and thus it was liable to indemnify. Implicit in the decision's reliance upon the policy definition of "occurrence" is that under New York law, coverage is implicated upon any exposure during the policy period, not simply during initial exposure.

The underlying AHAC policy in this case provides that coverage is triggered by an occurrence, and that an occurrence is an event which includes "continuous or repeated exposure" to conditions which result in personal injury. At the very least, the language of the policy, which includes "continuous * * * exposure," indicates that any type of inhalation of the asbestos fibers is an occurrence, and not just the first inhalation.

Any interpretation of an insurance contract implicates as a standard "the reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract" (*Atlantic Cement Co. v Fidelity & Cas. Co.*, 91 AD2d 412, 418, *affd* 63 NY2d 798). LAQ's ordinary expectation under a policy providing coverage for its employees' continued exposure would be coverage for more than the first inhalation. If AHAC had intended otherwise, it could simply have used the language "first exposure" in lieu of "continuous or repeated exposure."

The Superintendent argues that since the policy defines repeated exposure as one occurrence, "a claimant's repeated exposure to asbestos fibers over many years constitutes a single occurrence," relying on cases such as *Stonewall Ins. Co. v Asbestos Claims Mgt. Corp.* (73 F3d 1178), where the court found that clean-up costs for the removal of asbestos from buildings should be borne by the insurer on the risk at the time of the installation of the asbestos-containing materials. The Second Circuit there reasoned that property damage was actually incurred at the time of installation, and rejected one insurer's contention that the injury actually occurred at the time the damage was discovered (at 1209). There is a clear distinction between actual installation of asbestos-containing materials in a building, where the "injury" (the actual installation) occurs at a fixed date in time, and the long-term inhalation of asbestos fibers into the human body, where every respiration can be deemed to have contributed to and magnified the actual injury, i.e., the slow-forming asbestosis. Our

reading of the policy at issue indicates that the purpose of defining all exposure as one occurrence is to make clear that only one deductible will apply, and that the limit of liability, where an insurer has issued renewal policies, shall be the policy limits for one policy, rather than the aggregate for all policies issued. Otherwise, an insurer that issues a $1 million liability policy renewed 20 times could find itself liable for $20 million in damage claims for the same injury.

As to whether coverage may be triggered "in residence," the leading case for the proposition is *Keene Corp. v Insurance Co.* (*supra*), where the court was faced with deciding when coverage was triggered by an "occurrence," which was defined, as in this case, as " 'an accident, including injurious exposure to conditions, which results, during the policy period, in *bodily injury* * * * neither expected nor intended from the standpoint of the *insured*' " (667 F2d, at 1039 [emphasis in original]). All four underwriters in that case had provided coverage at various points in time when the inhalation actually occurred. One insurer argued that coverage was triggered by the inhalation of asbestos fibers, but that each company's coverage should be determined by the ratio of exposure years during its policy period to the entire period of inhalation; the other three advanced the notion that coverage was triggered only by actual manifestation of the injury, i.e., disease (at 1042-1043). The court found that in order to protect the insured, and to fulfill the ordinary expectations it had when it purchased the various insurance policies, coverage would be triggered by manifestation of the disease as well as exposure. It reasoned that otherwise, a policyholder would not be protected from future claims arising out of exposure from years earlier. The court observed that when insurers became aware of the virtually unlimited risks of asbestos coverage, they stopped writing such policies, so that unless the underwriters on the risk at the time of actual exposure were obligated to indemnify, the insured would be without coverage (at 1045-1046).

In *Keene* the insurers that had provided coverage at the time of inhalation were seeking to avoid their obligation to indemnify, when the actual injury did not manifest itself until much later, and the insured could no longer obtain coverage from other underwriters. There was an obvious inequity in depriving the insured of coverage for which it had paid a premium, and there was no doubt that the insurers had actually supplied coverage at the time the individual claimant was exposed. By contrast, Midland is here being asked to indemnify LAQ for

claims by individuals LAQ had employed earlier, prior to Midland's provision of coverage. When those individuals were employed, LAQ had coverage, albeit minimal, from other insurers. To the extent that equity is a concern, it favors Midland, which did not insure LAQ at the time of actual exposure.

The language of the AHAC policy, which Midland is contractually obligated to follow, provides insurance for an occurrence (including repeated exposure) that results in an injury. It does not recite that the trigger point for coverage is the time of the injury, but rather the time of the occurrence. When we consider the expectations of the insured, such language can only be reasonably interpreted to obligate the insurer to indemnify if the injured individual was actually exposed by inhalation, not when the disease manifests itself.

The Circuit Court for the District of Columbia has since acknowledged that its decision in *Keene* did not interpret New York law, and that New York law does not recognize the multiple-trigger doctrine. In *Abex Corp. v Maryland Cas. Co.* (790 F2d 119, 124), the court stated that New York law requires an " 'injury-in-fact' " trigger, and that the central issue is when the injury actually occurred, relying on the decision in *American Home Prods. Corp. v Liberty Mut. Ins. Co.* (565 F Supp 1485, *affd as mod* 748 F2d 760). In the cited case, which involved the ingestion of oral contraceptives, the District Court for the Southern District of New York indicated that to establish liability, the insured must prove an occurrence (exposure) and a result (injury) during the policy period, concluding that an "exposure that does not result in injury during coverage would not satisfy the policy's terms" (565 F Supp, at 1497).

While these decisions are consistent with our conclusion that New York does not follow the multiple-trigger theory advocated by LAQ, they still create a dilemma as to what constitutes an "injury" within the policy period. The trigger event in the policy at issue is *an occurrence which results in injury,* not the injury itself. In our view such policy language requires only an occurrence (inhalation) during the coverage period, and not the injury itself (the actual onset of asbestosis).

This latter approach obviously presents some difficulty, since not all inhalation of fibers results in asbestosis, any more than inhalation of tobacco always results in lung cancer (*see, e.g., Eagle-Picher Indus. v Liberty Mut. Ins. Co.*, 682 F2d 12, *cert denied* 460 US 1028). As has been noted, "A cumulative, progressive disease does not fit the disease or accident situation

which the policies typically cover" (*Insurance Co. v Forty-Eight Insulations*, 633 F2d 1212, 1222). Nevertheless, our approach appears to be as bright a line as can be established for determining when coverage has been triggered. If exposure never results in illness, the issue becomes academic. If illness does follow, it is more consistent with the "occurrence" language of the policy to find that the injury first occurred when the individual was actually exposed to asbestos fibers by inhalation, than to conclude that an insurer coming upon the risk after actual exposure by inhalation has terminated should be bound to indemnify the insured.

Thus, given the "round hole, square peg" category of an asbestos claim, and the "occurrence" language of the policy, the IAS Court correctly found that coverage is triggered by exposure, whether first or continued, but not by exposure in residence.

## (5) Application of New York Law

■ An ancillary question to the trigger dispute is presented by the fact that the District Court in New Jersey found that under the terms of AHAC's policy, coverage was triggered by exposure in residence and by manifestation, as well as by simple exposure (613 F Supp, *supra*, at 1557-1558). LAQ contends that this interpretation is binding upon Midland, since Midland agreed to follow the AHAC form. The Superintendent responds that since the judgment was vacated against Midland, the District Court's decision is not binding in this proceeding. We conclude that the decision is not binding because the District Court applied New Jersey law to AHAC's policy, and Midland's obligations should be interpreted under New York law.

Under normal circumstances, given the "follow-the-form" language of the Midland policy, the interpretation would have remained binding upon Midland, even in a liquidation proceeding, since liability under a primary policy triggers liability in an excess "follow the form" policy (*see, Jefferson Ins. Co. v Travelers Indem. Co.*, 92 NY2d 363, 369; *see also, Associated Indem. Corp. v Dow Chem. Co.*, 814 F Supp 613, 618). Thus, the definition of occurrence construed in the context of the primary policy would normally control the definition for interpretation of the excess policy (814 F Supp, at 618).

In this case, however, the Federal District Court applied New Jersey law (613 F Supp, *supra*, at 1554) in finding that exposure in residence could also trigger coverage. It has been

determined that the Midland policies are to be interpreted in the liquidation proceeding under New York law, since New York was Midland's place of business and as well as the State where the policy was written. Furthermore, public policy dictates that in a liquidation proceeding all creditors are to be treated equally (*Matter of Knickerbocker Agency [Holz]*, 4 AD2d 71, 73, *affd* 4 NY2d 245). In order to assure that all Midland creditors are treated equally and in accordance with conflicts of law principles, it is necessary that the court apply New York law in ascertaining whether an occurrence is triggered by exposure in residence, rather than defer to the District Court's decision. Otherwise, a non-LAQ claimant whose employment ceased before Midland issued a policy to his employer would not be able to recover against Midland, while the similarly situated LAQ employee would.

### (6) The Highlands Policy

■ The Federal District Court also found that since the Highlands policy had been canceled prior to its intended termination date, and since the first Midland policy was issued for the balance of the intended coverage period, the limits of the Highlands policy should be prorated for the period of time in which the policy actually existed. The court noted that there was no manifestation of agreement by the parties as to whether the $20 million limits would remain available for coverage of latent harm, and concluded that under the unique circumstances, where Midland succeeded to the policy risk for the balance of the initial coverage period, its indemnity limit should be deemed to be $2.5 million. The IAS Court found that the District Court decision was not binding upon Midland, and consequently rejected the District Court's reduction of the $20 million coverage to $2.5 million. It thus concluded that any sums due from Midland must be reduced by $17.5 million pursuant to the "Other Insurance" clause of the Midland policy, which requires exhaustion of prior excess policies before Midland's obligations attach.

LAQ argues that the court committed error because the "Other Insurance" and "Prior Insurance" clauses are only relevant in disputes over contribution between insurers, but cannot be used to deprive the insured of the coverage it purchased; that the Highlands policy was not issued prior to the Midland policy since it was actually delivered to LAQ only after the cancellation date; and that there are no amounts due the insured under the Highlands policy pursuant to the District

Court's conclusion that the prorated limits were actually $2.5 million.

The Superintendent claims that the plain wording of the Midland "Other Insurance" clause permits reduction of its obligation in the first instance to LAQ; that the limits of the Highlands policy were $20 million, no matter how short a time the policy was effective; and that the Highlands policy was issued prior to the Midland policy, regardless of the actual delivery date.

The AHAC policy, to which the Midland policy attaches under the "follow-the-form" language, provides for reduction in the amounts owed "if any loss is also covered in whole or in part under any other excess policy issued to the insured prior to the inception date hereof." It further provides that AHAC's coverage—and therefore, Midland's—shall be excess if "other collectible insurance with any other insurer is available to the insured covering a loss also covered hereunder."

With regard to LAQ's claim that since the Highlands policy itself was not, for some ministerial reason, actually delivered to LAQ until after the Highlands cancellation was effective, it would be absurd to conclude that the policy itself was not issued by Highlands prior to the issuance of the Midland policy. The Midland policy did not attach until after the Highlands policy was canceled. While in certain circumstances (e.g., a life insurance policy) the delivery date becomes the issuance date, a fair reading of the language of the AHAC/Midland policy, and a construction of the obvious intentions of LAQ and Midland with regard to the contract they formed, can only lead to the conclusion that the Highlands policy was issued first, then canceled, and the Midland policy then attached.

Likewise, a plain reading of the "Other Insurance" and "Prior Insurance" clauses defeats LAQ's claim that the clauses were to be used only to resolve disputes over contribution between insurers, but could not be used to reduce the amount owed by Midland to LAQ in the first instance. The clauses clearly provide that Midland's $20 million coverage obligation to LAQ would be reduced by any sums owed to LAQ by other excess policies on the same risk, and specifically preclude contribution.

Consequently, the only question with regard to the Highlands policy is whether the District Court's proration of the policy limits was binding on Midland. Inasmuch as the reduction was an adjudication of Highlands' contractual obligations to LAQ, and did not directly affect Midland, the IAS Court was not free

to find that the coverage available to LAQ from Highlands was still $20 million. Once the District Court decided that the Highlands policy limits were to be prorated, this became a binding construction with res judicata/collateral estoppel effect. The forum for Midland to attack the District Court's decision was the appeal from that order to the Third Circuit. The fact that the Third Circuit vacated any determinations made concerning Midland's obligations under its policy does not permit the Superintendent in this liquidation proceeding to challenge the District Court's adjudication of LAQ's rights under the Highlands policy.

The Superintendent correctly points out that case law generally holds that proration of policy limits is not permitted when the coverage period has been shortened (*see, e.g., Unigard Sec. Ins. Co. v North Riv. Ins. Co.*, 762 F Supp 566, 595-596, *affd in part and revd in part on other grounds* 4 F3d 1049). Nevertheless, proration has been permitted in this case, for whatever reason, and we cannot sit in appellate review of the District Court's decision.

### (7) "Other Insurance" Provisions in the Policies

The IAS Court declared that the policy issued by Employers' Liability to LAQ must be exhausted prior to the attachment of Midland's coverage, due to the "Other Insurance" provisions of Midland's coverage. LAQ contends that since Employers' Liability has refused to pay on the policies, such insurance is not "collectible" insurance "available" to LAQ, as provided in the "Other Insurance" clause, and consequently should not be used to reduce LAQ's rights. We agree, but conclude that LAQ should be given an opportunity to establish a bona fide reason for Employers' Liability's inability or refusal to pay before the Employers' Liability policy is deemed uncollectible.

The same declaration was made with regard to Canadian General's policy. LAQ contends that Canadian General met its obligations in full when it settled for $1.7 million. The Superintendent claims that the aggregate policy limits were $1.85 million. Since this appears to be merely a ministerial matter of arithmetic, and the case has already been referred to a Referee, no reason exists to disturb this declaration; the Referee can readily calculate the face limits of the policies, and subtract from them that which Canadian General has paid. If it is determined that Canadian General settled for less than the limit of its liability, certainly Midland's obligation should be reduced accordingly.

The IAS Court found that the policies issued by AHAC from 1976 to 1978 must also be exhausted before Midland is obligated to indemnify, since they constitute other insurance also available to LAQ for the same occurrences. The court reasoned that the "Other Insurance" clause did not limit coverage to current or prior years, and the contract should be enforced according to its terms. The court also concluded that not enforcing the clause would allow an insured to manipulate claims into years when it had more abundant coverage.

There is a dearth of case law on this issue in New York, with the exception of *Merchants Mut. Ins. Co. v Hartford Ins. Group* (145 Misc 2d 1), which concerned a dispute between insurers at the same level of coverage. We conclude that the "Other Insurance" language of the Midland policy is broad enough to cover all primary policies, prior and subsequent, which must be exhausted before Midland's excess policy can be called upon for indemnification (*see, Rhone-Poulenc, Inc. v International Ins. Co.*, 877 F Supp 1170 [applying Illinois law]). Since the provision is clear and unambiguous, there is no reason for the court to resort to interpretation. Knowing what the terms of Midland's coverage were, LAQ settled with AHAC before resolving this question, even though it could have sought protective language in the settlement, or deferred settlement until this issue was resolved.

The court found that any self-insured retention by LAQ also constituted other insurance which must be exhausted before triggering Midland's excess policy, reasoning that since a self-insured retention substitutes for insurance, the insured's choice to "go bare" should not inure to the detriment of the excess carrier. Nevertheless, the Midland policy specifically states only that it is providing $20 million excess of AHAC's $3 million layer, "and $500,000 S.I.R. in uninsured areas." It is evident that the only retention with which Midland was concerned was the $500,000 mentioned in the policy, and thus the unambiguous policy terms provide that Midland only required LAQ to exhaust $500,000 in self-insured retention. If it wished LAQ to exhaust all self-insured retentions in all policy years, it could easily have so provided in the policy. We do not believe that the word "insurance" in an "Other Insurance" clause can be construed to encompass self-insured retention (*see, Stratford School Dist. v Employers Reins. Corp.*, 162 F3d 718).

Midland claims that since it was in liquidation, its insurance was not collectible, and thus not subject to proration pur-

suant to the "Other Insurance" clauses of other policies providing coverage that is deemed "excess" to any otherwise available collectible insurance. Midland asserts that an insurer in liquidation does not have "collectible" funds. The IAS Court found that since some sums will be available in the liquidation proceeding, they are "collectible," and that there is also money available from the Security Fund established by statute (Insurance Law §§ 7603, 7609), which can be deemed collectible.

Where contemporaneous insurance policies contain respective "Other Insurance" clauses providing that each is deemed excess to other available and/or collectible insurance, the clauses cancel each other out, and "each insurer contributes in proportion to its limit amount of insurance" (*Lumbermens Mut. Cas. Co. v Allstate Ins. Co.*, 51 NY2d 651, 655). Thus, where other policies besides Midland's contain the "Other Insurance" clauses, Midland's coverage would normally have to be prorated with theirs.

In this case, however, Midland is in liquidation. This Court has stated that an insolvent insurance company has uncollectible insurance (*American Lumbermens Mut. Cas. Co. v Lumber Mut. Cas. Ins. Co.*, 251 App Div 231, 235). Since a condition precedent to the application of the "Other Insurance" clause is insurance that is collectible, it would appear that for purposes of allocating indemnity obligations, the Midland policy would not be affected by the "Other Insurance" clauses in other policies, and the IAS Court erred in finding that Midland had available insurance.

Regardless of whether Midland's obligations had become fixed prior to its entry into liquidation, the fact remains that it is no longer a viable underwriter with readily available coverage. Furthermore, the Security Fund is not insurance, but a pool of money contributed by insurers doing business in New York for the payment of allowed claims of policyholders and injured parties (*see, Matter of Allcity Ins. Co. [Kondak]*, 66 AD2d 531, 537, *lv dismissed in part and denied in part* 48 NY2d 629). If and when LAQ's claim against Midland is fixed in a sum certain, and Midland's assets have been marshaled, then the claim may be submitted to the Security Fund for treatment along with all other claims. At this point, however, there is no guaranty that any of Midland's assets will be available to creditors. Thus, it is impossible to state that there is $20 million in insurance that is collectible from Midland.

## (8) Other Potential Coverage

Finally, there are apparently other subsequently issued policies also available to LAQ, some of which contain exclusions for asbestos coverage only, some of which contain no exclusions, and some of which contain exclusions for asbestosis and silicosis. The court found that the Superintendent had failed to meet its burden of showing that policies issued subsequent to March 15, 1978 containing "asbestosis" exclusions constitute "other valid and collectible insurance" as that term is used in the "Other Insurance" clauses referred to in the Midland policies and as applied to LAQ's underlying asbestos liabilities, essentially because these policies were not included in the record. We believe that the court should have made no declaration once it found that Midland had failed to meet its burden, and instead should have directed a hearing on the issue, where the policies could be reviewed. The Referee could then report and recommend whether the exclusions encompass all asbestos-related ailments, and the court could then rule whether the policies with the exclusions can still be considered other collectible insurance.

Accordingly, the order of Supreme Court, New York County (Beverly Cohen, J.), entered August 5, 1998, which, *inter alia*, provided as follows:

- Granted in part and denied in part the Superintendent's motion to confirm and LAQ's cross motion to reject the Referee's Report and Recommendation dated January 26, 1993;

- Declared that coverage under the Midland policy for asbestos-related personal injury claims is triggered by exposure to asbestos occurring during the policy period;

- Declared that the "Prior Insurance" clause contained in the Midland policies is applicable only to other excess coverage policies of insurance, and is not applicable to primary insurance policies;

- Declared that the policies issued to LAQ by Employers' Liability Assurance Corporation for policy periods from 1954 through 1962, and by Canadian General Insurance Company for policy periods from 1962 through 1976, do not constitute excess policies of insurance within the meaning of the "Prior Insurance" clause of the Midland policies;

- Declared that Highlands Insurance Company policy No. SR 10644 was "issued" on March 15, 1975;

- Declared that the Superintendent is not bound by either the settlement or judgment in the matter denominated *Lac D'Amiante du Quebec v American Home Assur. Co.* (613 F Supp 1549 [D NJ, *mod to vacate and dismiss as against Midland* 864 F2d 1033 [3d Cir], *supra*);

- Declared that the Highlands policy constitutes an "other" excess policy issued to LAQ prior to the inception date of the Midland policy, as defined in the "Prior Insurance" clause of the Midland policy;

- Declared that the "Prior Insurance" clause in the Midland policy operates to reduce the limits of that policy by $17.5 million, an amount that remains due to LAQ under the Highlands policy;

- Declared that for purposes of the claim in this matter only, the liability limits of all the Midland policies are deemed "collectible" and "available," as those terms are used in the "Other Insurance" clauses of policies other than Midland's;

- Declared that the "Other Insurance" clauses contained in the Midland policies apply to all policies of insurance providing coverage to LAQ that are triggered by the same claims that trigger the Midland policies and that were issued prior or subsequent to the Midland policies;

- Declared that as to any policies issued subsequent to the Midland policies which contain or incorporate a "Prior Insurance" clause, the Superintendent has failed to carry his burden of proving that the Midland policies need not be exhausted prior to recourse to those subsequent policies;

- Declared that the policies of Employers' Liability and Canadian General must be exhausted prior to the Midland policies to the extent, if any, that those policies have not already been exhausted;

- Declared that LAQ's self-insured retention for each period in which LAQ remained self-insured for primary or excess coverage shall constitute "other

valid and collectible insurance," as that term is used in the "Other Insurance" clause in the Midland policies;

- Declared that the insurance coverage provided by Employers' Liability is available pursuant to the "Other Insurance" clause of the Midland policies;

- Declared that the Superintendent has failed to meet his burden to show that the policies issued to LAQ by CNA and First State Insurance Company for the period March 15, 1977 through March 15, 1978, and American Home Assurance Company subsequent to March 15, 1978, constitute "other valid and collectible insurance," as that term is used in the "Other Insurance" clause in the Midland policies;

- Declared that the Superintendent has failed to meet his burden to show that policies issued to LAQ for periods subsequent to March 15, 1978 containing "asbestosis" exclusions constitute "other valid and collectible insurance," as that term is used in the "Other Insurance" clause in the Midland policies and as applied to LAQ's underlying asbestos liabilities; and

- Ordered a reference to hear and report on the amounts remaining due from LAQ's self-insured retentions and policies issued by Employers' Liability, Canadian General, AHAC and Midland, should be modified, on the law, so as to

- Declare that coverage under the Midland policy for asbestos-related personal injury claims is triggered by exposure to asbestos by inhalation, whether first or subsequent, and not by exposure "in residence";

- Declare that the Superintendent is bound by the judgment in the Federal action only to the extent that the judgment adjudicated LAQ's rights under policies other than Midland's, including the Highlands policy;

- Vacate the declaration that, with reference to the Highlands policy, Midland's liability to LAQ is reduced by $17.5 million;

- Vacate the declaration that the liability limits of the Midland policies are deemed "collectible" and "available," as those terms are used in the "Other Insurance" clauses of policies other than Midland's, and declare that the limits of the Midland policies are neither "collectible" nor "available" under the "Other Insurance" clauses of the non-Midland policies;

- Vacate the declaration that the Superintendent has failed to meet his burden of proving that the Midland policies need not be exhausted prior to the implication of any subsequent policies containing "Other Insurance" clauses;

- Vacate as premature the declaration that the Employers' Liability policy must be exhausted prior to the implication of the Midland policies, and grant LAQ leave to establish that the funds are uncollectible for reasons other than unjustified refusal by Employers' Liability to pay;

- Vacate the declaration that LAQ's self-insured retention for all policy periods constitutes "other valid and collectible insurance," as defined in the Midland policies, and declare that Midland's obligations shall be reduced only by the $500,000 self-insured retention recited in the Midland policy;

- Vacate the declaration that the Superintendent has failed to meet his burden of proving that the CNA, First State and AHAC policies constitute "other valid and collectible insurance," as that term is used in the "Other Insurance" clause in the Midland policies, and declare that to the extent said policies cover the same risk, they constitute "Other Insurance"; and

- Vacate the declaration that the Superintendent has failed to meet his burden with regard to policies containing "asbestosis" exclusions, and direct remand for further review of that issue upon production by LAQ of the policies which Midland contends constitute "Other Insurance," and as so modified, affirmed, without costs.

LERNER, RUBIN and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered August 5, 1998, modified, on the law, so as to declare that coverage under the Midland policy for asbestos-related personal injury claims is triggered by exposure to asbestos by inhalation, whether first or subsequent, and not by exposure "in residence"; declare that the Superintendent is bound by the judgment in the Federal action only to the extent that the judgment adjudicated the claimant's (hereinafter LAQ) rights under policies other than Midland's, including the Highlands policy; vacated the declaration that with reference to the Highlands policy, Midland's liability to LAQ is reduced by $17.5 million; vacate the declaration that the liability limits of the Midland policies are deemed "collectible" and "available," as those terms are used in the "Other Insurance" clauses of policies other than Midland's, and declare that the limits of the Midland policies are neither "collectible" nor "available" under the "Other Insurance" clauses of the non-Midland policies; vacate the declaration that the Superintendent has failed to meet his burden of proving that the Midland Policies need not be exhausted prior to the implication of any subsequent policies containing "Other Insurance" clauses; vacate as premature the declaration that the Employers' Liability policy must be exhausted prior to the implication of the Midland Policies, and grant LAQ leave to establish that the funds are uncollectible for reasons other than unjustified refusal by Employers' Liability to pay; vacate the declaration that LAQ's self-insured retention for all policy periods constitutes "other valid and collectible insurance," as defined in the Midland policies, and declare that Midland's obligations shall be reduced only by the $500,000 self-insured retention recited in the Midland policy; vacate the declaration that the Superintendent has failed to meet his burden of proving that Continental Casualty Company and Transportation Insurance Company, First State and American Home Assurance Company policies constitute "other valid and collectible insurance," as that term is used in the "Other Insurance" clause in the Midland policies, and declare that to the extent said policies cover the same risk, they constitute "Other Insurance;" and vacate the declaration that the Superintendent has failed to meet his burden with regard to policies containing "asbestosis" exclusions, and direct remand for further review of

that issue upon production by LAQ of the policies which Midland contends constitute "Other Insurance," and as so modified, affirmed, without costs.