OPINION OF THE COURT
Michael D. Stallman, J.
In this liquidation proceeding of Midland Insurance Company, certain policyholders seek a determination of the law that governs the interpretation of their policies. In denying the policyholders’ claims, the liquidator applied New York law to the interpretation of their policies. The liquidator believes that the Appellate Division held in Matter of Midland Ins. Co. (269 AD2d 50 [1st Dept 2000]) that New York law applies to all Midland creditors. The policyholders disagree, arguing that the liquidator should have used the “grouping of contacts” approach of the Restatement (Second) of Conflict of Laws.
*490 L
A. Background
Midland began as a stock casualty insurer incorporated under the laws of Delaware, with its principal office in New York, New York. Midland was a multi-line carrier which wrote, among other things, a substantial amount of excess coverage for major Fortune 500 companies that thereafter faced significant environmental, asbestos, and product liability claims starting in the 1980s.
In 1985, the New York State Insurance Department proceeded to monitor Midland’s impaired financial condition. On March 7, 1986, the Insurance Department directed Midland to eliminate its financial impairment and insolvency, or else the Insurance Department would seek an order placing Midland into receivership. Midland’s board of directors voted unanimously to consent to entry of a liquidation order pursuant to Insurance Law § 7404. By order dated April 3, 1986, Justice Thomas Hughes placed Midland into liquidation.
As required under Insurance Law § 7434, payments to be distributed from the insolvent estate are made upon the recommendation of the superintendent, and under the direction of the court, i.e., the Supreme Court justice assigned to supervise the liquidation.
By order dated March 15, 1994, Justice Beverly Cohen approved the procedure for disallowance of claims.[1] Claimants who object to the liquidator’s recommendation for disallowance of *491 their claims must serve timely written objections to the liquidator. Timely objections are then referred to a court-appointed referee to hear and report on the validity of the claimant’s objections.
In 2006, certain major policyholders (MPHs),[2] the liquidator, and reinsurers approached this court to fashion a more efficient procedure to address common objections affecting disallowed claims of these policyholders.[3] The liquidator had denied these policyholders’ claims, based, in part, on the decision of the Appellate Division, First Department, in Matter of Midland Ins. Co. (269 AD2d 50 [2000] [hereinafter LAQ]). Because the objections are based on issues of law, the MPHs, the liquidator, and reinsurers wanted the court to decide the common issues of law instead of presenting them seriatim before the Special Referee. A series of conferences on this split procedure before the Special Referee and the court culminated in case management stipulation and order No. 1.
B. The Case Management Stipulation and Order No. 1
Case management stipulation and order No. 1, so-ordered July 31, 2006 (CMO No. 1) permits the liquidator and MPHs whose claims were disallowed, in whole or in part, to make motions to the court to address common legal issues that otherwise would have been litigated before the Special Referee appointed to hear policyholders’ objections. Exhibit A of CMO No. 1 lists the roughly 300 claims at issue. Thus, if CMO No. 1 were not in place, the Special Referee might have conducted 300 separate *492 hearings on denied claims and might have issued up to 300 separate decisions on recurring legal issues, which this court would then be obligated to review and confirm or reject.
The legal issues are divided into two phases. Phase 1 addresses “whether New York substantive law governs the interpretation and application of the Midland insurance policies at issue in this litigation or whether the Court must conduct an analysis utilizing the New York choice-of-law test to determine which jurisdiction’s or jurisdictions’ law(s) apply.” (CMO No. 1, § III.C.l.) Phase 2 addresses the appropriate event that triggers coverage under certain categories of Midland policies, and “whether the policyholders have any obligation to exhaust other solvent and insolvent coverage prior to accessing its Midland policies.” (CMO No. 1, § III.C.8.) CMO No. 1 established committees of MPHs and reinsurers. MPHs agreed to submit, as a group, a single brief on the issues, instead of individual briefs; reinsurers also agreed to submit a collective brief, with an option to submit an individual brief on the phase 1 issue. With the agreement of the policyholders and the liquidator, the court also permitted reinsurers to intervene in a particular phase or phases of CMO order No. I.[4]
From a procedural standpoint, CMO No. 1 constitutes a so-ordered stipulation modifying the portion of Justice Beverly Cohen’s order referring all objections to disallowed claims to a special referee. (See CPLR 4311.) Instead of directing the Special Referee to determine all the objections to an entire claim, CMO No. 1 removes the phase 1 and phase 2 issues from the scope of the reference, thereby leaving those issues to fall back within the court’s purview. Thus, to conserve judicial resources, this court granted the parties’ request for this court to determine certain common legal issues instead of raising them piecemeal before the Special Referee.
Before this court is the policyholders’ motion on the phase 1 issue. The phase 1 issue affects all these policyholders’ claims, but would not be entirely dispositive as to whether the Superintendent of Insurance, as liquidator of Midland, properly denied the policyholders’ claims. Accordingly, the policyholders’ motion *493 is styled as a motion for partial summary judgment, as suggested by this court. Once this court decides the legal issues common to all the denied claims in phases 1 and 2, the claims will be referred to the Special Referee for consideration of any specific policyholder objections.
Swiss Re brings a cross motion for partial summary judgment, seeking a ruling that New York substantive law shall apply to all policyholders’ claims in this liquidation.
IL
The issue presented on this motion is whether New York substantive law governs and applies to the interpretation of the Midland insurance policies at issue in this litigation, or whether the liquidator and the Referee must analyze the law applicable to the policies using the “grouping of contacts” approach of the Restatement (Second) of Conflict of Laws. The liquidator believes that the Appellate Division, First Department, held that New York law must apply to every claim in the liquidation in Matter of Midland Ins. Co. (269 AD2d 50 [2000]). The policyholders disagree with the liquidator’s reading of LAQ, and argue that the language upon which the liquidator relies is dicta.
A.
In LAQ, the Appellate Division, First Department, addressed, among other things, the issue of whether the court supervising Midland’s liquidation was bound by the rulings in Lac d’Amiante du Quebec, Ltee. v American Home Assur. Co. (613 F Supp 1549 [D NJ 1985], vacated in part 864 F2d 1033 [3d Cir 1988]).
Lac d’Amiante du Quebec, Ltee. was a Delaware corporation with its principal place of business in Quebec, Canada, where Lac d’Amiante had been engaged in the mining, milling, and selling of asbestos fiber. Lac d’Amiante brought a declaratory judgment action in the United States District Court in New Jersey against American Home Assurance Company (AHAC), Highlands Insurance Company, and Midland, regarding insurance coverage of asbestos-related personal injury and property damage claims against Lac d’Amiante. AHAC had issued a $3 million umbrella policy covering Lac d’Amiante. Lac d’Amiante had purchased $20 million in excess coverage from Midland, “which also followed the form of the underlying AHAC *494 policy,[5] provided that it was in excess of both the $3 million AHAC coverage and a $500,000 self-insured retention by [Lac d’Amiante].” (LAQ, 269 AD2d at 54.)
The District Court applied the law of New Jersey in interpreting AHAC’s and Midland’s policies, “applying] the conflict of law rules of the state in which it sits.” (Lac d’Amiante du Quebec, Ltee., 613 F Supp at 1554.) A critical issue presented was determining when bodily injury occurred for purposes of triggering insurance coverage. The District Court adopted each of the following coverage triggers as to personal injury claims: (1) if the individual inhaled asbestos when the policies were in effect (inhalation exposure); (2) if the policies were in effect during the latent, residence period after initial exposure to asbestos (exposure in residence); and (3) if an asbestos disease has actually manifested itself during the policy period. (Id. at 1558.) On appeal, the United States Court of Appeals for the Third Circuit vacated the portion of the District Court’s determination as against Midland for lack of jurisdiction. The Third Circuit ruled that the District Court should have declined to exercise jurisdiction over Midland, which was placed into liquidation during the pendency of the District Court action. (Lac d’Amiante du Quebec, Ltee., 864 F2d at 1049.)
In the Midland liquidation, Lac d’Amiante argued that, because. Midland’s excess policy followed form to the ABAC policy, the liquidation court was bound by the Federal District Court’s interpretation of AHAC’s policy. Accordingly, Lac d’Amiante asserted that Midland’s excess policy should recognize exposure-in-residence as a coverage trigger.
Lac d’Amiante’s argument presented a dilemma. Oh the one hand, no one disputed that Lac d’Amiante’s excess policy with Midland should be interpreted under New York law, which did not recognize exposure-in-residence as a coverage trigger for *495 personal injury claims of asbestos exposure. On the other hand, New York cases give an excess policy following form the same interpretation given to the underlying policy which it follows. Thus, if Lac d’Amiante’s policy with AHAC were held to recognize exposure-in-residence as a coverage trigger, the dilemma is whether Midland’s excess policy would follow the determination, even if New York law did not recognize such a coverage trigger.
By decision and order dated September 14, 1994, Justice Beverly Cohen, who was then assigned to Midland’s liquidation, rejected Lac d’Amiante’s argument. (Matter of Midland Ins. Co., 164 Misc 2d 363, 368-369 [Sup Ct, NY County 1994].) Justice Cohen reasoned,
“The form-following provision in Midland’s policy .requires adherence to the ‘insuring agreements . . . of the underlying insurance’, that is, the actual language of the AHAC policy. LAQ has provided no authority for its novel argument that this form-following clause was intended to contractually bind Midland, as well as this court, to the judicial interpretation given to the AHAC policy by another court in a related, but wholly noncontrolling decision.” (Id. at 368.)
On appeal, the Appellate Division, First Department, acknowledged the prior New York case law on excess policies following form, but departed from the rule:
“Under normal circumstances, given the ‘follow-the-form’ language of the Midland policy, the interpretation would have remained binding upon Midland, even in a liquidation proceeding, since liability under a primary policy triggers liability in an excess ‘follow the form’ policy. Thus, the definition of occurrence construed in the context of the primary policy would normally control the definition for interpretation of the excess policy.
“In this case, however, the Federal District Court applied New Jersey law in finding that exposure in residence could also trigger coverage. It has been determined that the Midland policies are to be interpreted in the liquidation proceeding under New York law, since New York was Midland’s place of business and as well as the State where the policy was written. Furthermore, public policy dictates that in a liquidation proceeding all creditors are to be *496 treated equally. In order to assure that all Midland creditors are treated equally and in accordance with conflicts of law principles, it is necessary that the court apply New York law in ascertaining whether an occurrence is triggered by exposure in residence, rather than defer to the District Court’s decision. Otherwise, a non-LAQ claimant whose employment ceased before Midland issued a policy to his employer would not be able to recover against Midland, while the similarly situated LAQ employee would.” (LAQ, 269 AD2d at 62-63 [citations omitted and emphasis added].)
In other words, the Appellate Division opined that “similarly situated” claimants, i.e., those claimants alleging similar injuries, must show entitlement to coverage under any Midland excess policy under the same standards. The court viewed it as unfair that a Midland excess policy following form could afford different coverage for claimants asserting similar injuries, depending on the underlying policy which the excess policy followed. Had the Appellate Division ruled that New Jersey law governs claims submitted by Lac d’Amiante, then a Lac d’Amiante employee would be treated differently than an employee who worked for a New York company, even though both employees had similar personal injuries. The Lac d’Amiante employee could prove insurance coverage using exposure-in-residence as a coverage trigger recognized under New Jersey law, whereas the other employee could not.
On choice of law issues, the liquidator, the MPHs, and the intervening reinsurers all agree that, where an issue arises as to the law applicable to an insurance policy, New York follows the “grouping of contacts” approach of the Restatement (Second) of Conflict of Laws.[6] However, based on the language in LAQ quoted and emphasized above, the liquidator and intervening *497 reinsurers read LAQ to hold that the substantive law of New York applies to all claims in the Midland liquidation. (Owen opposing affirmation ¶ 7.) The policyholders argue that LAQ did not establish a bright-line rule, and that the liquidator must determine the law applicable to each policy using the “grouping of contacts” approach.
B.
The Appellate Division’s reasoning in LAQ can be distilled as follows: (1) New York law applies to the policy that Midland issued to Lac d’Amiante; (2) all creditors of Midland must be treated equally; and (3) therefore, New York law applies to all creditors of Midland.
Although the policyholders point out that the Appellate Division did not expressly hold in LAQ that New York law must apply to all Midland claims, that determination is necessary to LAQ’s result. The Appellate Division reasoned that the application of another state’s law to any Midland policy would create inequality among Midland’s creditors. For claimants to be treated equally and fairly, the Appellate Division insisted on uniformity of result, which is possible only by applying one state’s law to all claims in the liquidation.
No one disputed in LAQ that New York law applied to the interpretation of the Midland excess policy issued to Lac d’Amiante, and the Appellate Division’s own conflicts of law analysis confirmed it. The policyholders therefore contend that it was not necessary for the Appellate Division to reach the issue of whether one state’s law should apply to every Midland creditor, and that the Appellate Division’s opinion on the choice of law issue should be considered dicta.
“[A]n extraneous, gratuitous and casually expressed statement, particularly in a case where the issue was neither argued nor factually relevant, can carry no controlling weight.” (People v Bourne, 139 AD2d 210, 216 [1st Dept 1988].) “Dicta, while not without importance, is not required to be followed.” (Robinson Motor Xpress, Inc. v HSBC Bank, USA, 37 AD3d 117, 124 [2d Dept 2006].)
Here, the Appellate Division viewed it necessary to rule that New York law applied to every claim in the liquidation proceed *498 ing to depart from New York case law on excess policies following form, perhaps to address Justice Beverly Cohen’s view that there was “no authority . . . that [a] form-following clause was intended to contractually bind Midland, as well as this court, to the judicial interpretation” given to the underlying policy. (Matter of Midland Ins. Co., 164 Misc 2d at 368.)
The Appellate Division stated that, “[u]nder normal circumstances, given the ‘follow-the-form’ language of the Midland policy, the interpretation [of the primary policy by the Federal District Court in New Jersey] would have remained binding upon Midland, even in a liquidation proceeding” (LAQ, 269 AD2d at 62 [emphasis added]). To follow New York law, which undisputably applied to Midland’s policy, could mean that the Appellate Division could not reject the interpretation of the Federal District Court.
To untether Midland’s excess policy from the underlying AHAC policy, the Appellate Division in LAQ apparently saw the question as a choice of law issue. That is, the Appellate Division apparently recognized that an excess policy following form is bound to the interpretation of the underlying policy because it implicitly must follow the law applicable to the underlying policy. Yet, the court believed that, if for some reason, an excess policy following form cannot follow the law applicable to the underlying policy, then that excess policy cannot be bound by an interpretation of the underlying policy. By holding that New York law applied to every Midland creditor, LAQ creates the legal impediment that prevents an excess policy following form to follow a policy governed by New Jersey law.
Because the reasoning of the Appellate Division decided an issue that was actually presented, this court disagrees with the policyholders’ argument that the Appellate Division was speaking in dicta when it reasoned, “In order to assure that all Midland creditors are treated equally and in accordance with conflicts of law principles, it is necessary that the court apply New York law in ascertaining whether an occurrence is triggered by exposure in residence, rather than defer to the District Court’s decision.” {LAQ, 269 AD2d at 63.) The Appellate Division believed that it was not enough to determine the law applicable to the policy that Midland issued to Lac d’Amiante; rather, it felt it necessary to determine the law applicable to everything in Midland’s liquidation to ensure that the liquidation court could not defer to the Federal District Court’s decision.
*499 The consequences of LAQ are far-reaching. LAQ would not be limited to policies where a choice of law issue is presented. LAQ’s concern for treating creditors equally would apparently require invalidating a choice of law provision in an insurance contract, and would upend laws respecting the parties’ contractual choice of law. (See General Obligations Law § 5-1401.) In the Appellate Division’s example of two similarly situated employees, if the policies issued to Lac d’Amiante had expressly designated New Jersey law as the law applicable to the interpretation of those policies, there would be still a difference between the treatment of a “LAQ claimant” and a “non-LAQ claimant.” It was this difference in treatment that the Appellate Division highlighted to justify application of New York law to all Midland creditors.
The court rejects the liquidator’s contention that LAQ merely followed the “grouping of contacts” approach of the Restatement (Second) of Conflict of Laws, giving dispositive weight to New York law for public policy reasons, i.e., the need to treat creditors of the insolvent insurer equally. There was no need to create or invoke any additional factor to justify the application of New York law, because the Appellate Division already looked at factors that pointed to New York — Midland’s place of business, and the place where the policy was issued. (LAQ, 269 AD2d at 63.) Had the Appellate Division focused on these two factors alone, New York law might have applied to almost all the policies in this liquidation proceeding, because Midland’s place of business is common to all Midland policies, and its place of business is likely to be where all the policies were issued. The concern for treating all Midland’s creditors equally therefore was more than just another factor to be weighed in a “grouping of contacts” analysis.
Moreover, the equitable administration of the liquidation of an insolvent insurer is not a concern unique to New York. “[T]he Uniform Insurers Liquidation Act [Insurance Law § 7408 et seq.] was adopted with the main purpose in mind of providing a uniform system for the orderly and equitable administration of the assets and liabilities of defunct multistate insurers.” (G. C. Murphy Co. v Reserve Ins. Co., 54 NY2d 69, 77 [1981].) Many states, including New York, have adopted the Uniform Insurers Liquidation Act (UILA).[7] The equitable administration of an insolvent estate does not call for the exclusive application of any *500 particular state’s law. Following the liquidator’s logic, New York law would apply to every liquidation proceeding commenced in New York, even in the situation where every other factor in the “grouping of contacts” analysis pointed to contacts with another state.
If LAQ involved only a choice of law analysis, then any choice of law analysis would have been limited to the law applicable to the policy before the Appellate Division, which the policyholders contend would be dicta with regard to the law applicable to their own policies. However, LAQ clearly intended its ruling on the application of New York law to apply to every Midland creditor, given its expressed rationale of treating all Midland creditors equally.
However, the court disagrees with the liquidator’s argument that LAQ must continue to be applied as the law of the case. Policyholders of an insurance company in liquidation are not parties to the liquidation proceeding, although the purpose of the liquidation is to protect their interests as creditors of the defunct insurer. Moreover, no one asserts that the policyholders here had any full and fair opportunity to be heard in LAQ.
Given that LAQ holds that New York law must apply to all claims in the liquidation proceeding, the liquidator correctly argues that the issue presented on this motion is whether stare decisis requires this court to follow LAQ. “The doctrine of stare decisis requires that courts of original jurisdiction follow the decisions and precedents of the Appellate Division, which have jurisdiction of law and fact.” (Ross Bicycles v Citibank, 149 AD2d 330, 331 [1st Dept 1989].) “Distinctions in the application and withholding of stare decisis require a nice delicacy and judicial self-restraint. At the root of the techniques must be a humbling assumption, often true, that no particular court as it is then constituted possesses a wisdom surpassing that of its predecessors.” (People v Hobson, 39 NY2d 479, 488 [1976].)
“The doctrine of stare decisis does not, of course, demand unyielding resignation to even recent precedent . . . Whether it is appropriate for the courts to overturn judicial precedent must depend on sev *501 eral factors. Among them will be the nature of the rights and interests at stake and the extent and degree to which action may justifiably have been taken in reliance on the precedent. In addition to such familiar considerations but apart therefrom, weight may properly be attached to the relative ease or difficulty of modification or change in the precedent.” (Matter of Higby v Mahoney, 48 NY2d 15, 18 [1979] [citations omitted].)
The policyholders assert that amendments to article 74 of the Insurance Law effectively “nullified” LAQ’s rationale. (Mem at 14.) When Justice Beverly Cohen rendered her decision in 1994, insurance companies in liquidation in New York, like Midland, were parity estates — i.e., the assets of the insurer were divided equally among all the creditors of the estate. In 1999, the Legislature amended Insurance Law § 7434 to establish a priority of distribution of the assets of a liquidated insurer among creditors, by creating nine different classes. (L 1999, ch 134.) In 2005, the Legislature enacted Insurance Law § 7434 (e), which applied the 1999 scheme to any distribution made after May 11, 2005 (the effective date of the amendment) in pending liquidations. (L 2005, ch 33.) Because the amendments to article 74 no longer permit Midland’s assets to be divided equally among all its creditors, the policyholders contend that the Appellate Division’s concerns for the equal treatment of creditors is no longer valid. Although all creditors can no longer be treated equally, the liquidator and reinsurers contend that it remains possible to treat creditors in the same class equally. Because policyholders are placed in the same priority class of creditors, the liquidator and reinsurers maintain that LAQ’s rationale is still valid.
Equality among creditors in an insurance liquidation has traditionally been understood to mean equal distribution of the defunct insurer’s assets, i.e., pro rata distribution. (See Skandia Am. Reins. Corp. v Schenck, 441 F Supp 715, 726 [SD NY 1977] [collecting cases].) However, as the liquidator and reinsurers point out, the concept of equal treatment of creditors in LAQ did not refer to equal distribution, but rather equal and uniform treatment of all creditors.
The court rejects the reinsurers’ contention that the amendments to article 74 of the Insurance Law are immaterial because the Appellate Division did not discuss them when it decided LAQ, which was decided after the amendments were passed. *502 (Reinsurers’ mem at 23 n 8.) The 1999 amendments were not raised in the parties’ appeal of Justice Beverly Cohen’s decision, and the amendments to article 74 which effectively made the distribution scheme retroactive were passed after the Appellate Division decided LAQ. Therefore, no inference can be reasonably drawn from the Appellate Division’s silence in LAQ on the effect, if any, of amendments to article 74 of the Insurance Law.
Inasmuch as LAQ calls for a uniform application of law to the claims against Midland, the amendments to article 74 do not undercut its rationale. However, since LAQ was decided, the Appellate Division, First Department, has spoken directly on the issue of the appropriate weight to be given to the Restatement’s factors when a choice of law issue is presented. (See Certain Underwriters at Lloyd’s, London v Foster Wheeler Corp., 36 AD3d 17, 27 [2006].) As the policyholders indicate, Foster Wheeler Corp. raises the issue of whether LAQ’s holding — that New York law must be applied to all claims in a liquidation proceeding — is still good law.
C.
In Foster Wheeler Corp., the Appellate Division, First Department, addressed the issue of the law applicable to the excess insurance policies covering claims for asbestos-related personal injury claims, where the claims had been asserted throughout the United States. The insured, Foster Wheeler Corporation, had its principal place of business in New York City from 1900 to 1962, and thereafter it moved to New Jersey, leaving behind a small office of one employee in New York City. The excess liability policies at issue were issued from 1970 to 1981. The principal places of business of the insurers were located in various states at the time the policies were issued; five were domiciled in New York, three in New Jersey.
Applying the “grouping of contacts” of the Restatement (Second) of Conflict of Laws, the motion court declared that New York law applied. However, the Appellate Division reversed the decision and declared that New Jersey law applied. Writing for a unanimous panel, Justice Friedman stated,
“[W]e regard the state of the insured’s domicile to be a proxy for the principal location of the insured risk, which, under New York law and Restatement § 193, is the controlling factor in determining the law applicable to a liability insurance policy, thereby obviating the need to consider all five Restatement *503 factors. Even if consideration of all five Restatement factors were required, however, we still would conclude that New Jersey law should be applied. Further, we would reach the same conclusion even if, as the nonsettling insurers argue, New York constituted the place of contracting, negotiation, and the insured’s performance. This is because the Restatement factors ‘are to be evaluated according to their relative importance with respect to the particular issue’ (Restatement § 188 [2] ). . . . In the case of a liability insurance policy covering risks in multiple states, the state of the insured’s principal place of business has a greater concern with issues of policy construction and application bearing on the amount of available coverage than do the states where contracting, negotiation, or payment of the premium happened to occur.” (Foster Wheeler Corp., 36 AD3d at 26-27.)
The Court of Appeals affirmed the decision for the reasons stated by Justice Friedman. (Certain Underwriters at Lloyd’s, London v Foster Wheeler Corp., 9 NY3d 928 [2007].)
Foster Wheeler Corp. contradicts LAQ. In evaluating the Restatement’s factors for the applicable law, Foster Wheeler Corp. holds that the insured’s domicile “is the controlling factor” for an insurance policy covering risks located in more than one state. (Foster Wheeler Corp., 36 AD3d at 27.) Coverage of risks located in more than one state characterizes many policies that insured companies that mined and sold asbestos. By contrast, the Appellate Division in LAQ gave weight only to where the defunct insurer’s principal place of business was located, and the place where the policy was written. (LAQ, 269 AD2d at 63.)
Although Foster Wheeler Corp. did not involve an insurance liquidation, Justice Friedman emphasized that
“[e]ach policy constitutes a separate contractual transaction, and to treat insurance policies issued at various widely separated points in time, over a span of decades, as one undifferentiated aggregate for the purpose of choosing one state’s law to govern them all, would do considerable violence to the principle . . . that the contacts on which the choice-of-law determination depends should have been known to the parties at the time of contracting {see Restatement § 188, Comment e, at 580 [a *504 contact ‘can bear little weight in the choice of the applicable law when ... at the time of contracting it is either uncertain or unknown’]).” (Foster Wheeler Corp., 36 AD3d at 32.)
The liquidation of an insurance company is very likely to be uncertain or unknown at the time the parties contract for an insurance policy. A policyholder would not likely procure an insurance policy from an insurer whom the policyholder knows will become insolvent. Therefore, the place of where the insurance liquidation is pending should bear little weight to the applicable choice of law.
Moreover, the Court of Appeals has made clear that “liquidation cannot place the liquidator in a better position than the insolvent company he takes over, authorizing him to demand that which the company would not have been entitled to prior to liquidation . . . Those rights were not altered merely because a liquidation order was entered.” (Matter of Midland Ins. Co., 79 NY2d 253, 264-265 [1992].) To demonstrate how a choice-of-law rule might put the liquidator in a better position than prior to the liquidation, the policyholders offer the example of a pollution exclusion in a Midland insurance policy covering environmental risks. Assume that the pollution exclusion is unenforceable in the state in which the policyholder’s principal place of business is located, but the pollution exclusion is enforceable in New York. Under LAQ, New York law would apply because Midland is in liquidation, and the pollution exclusion would therefore be enforceable. The liquidator could therefore invoke the pollution exclusion, even though the exclusion would have been invalid but for the liquidation. However, under Matter of Midland Ins. Co. (79 NY2d 253 [1992], supra), the liquidator would have the same rights and liabilities as Midland prior to its insolvency. Matter of Midland Ins. Co. therefore dictates that the choice of law rule announced in Foster Wheeler Corp. applies to liquidation proceedings. Under Foster Wheeler Corp., the law of the policyholder’s principal place of business would apply to an insurance policy insuring risks in multiple states, whether or not Midland is in liquidation.
This court recognizes that following Foster Wheeler Corp. makes it impossible to apply only one state’s law to all Midland creditors. The principal places of business of Midland’s policyholders are not all located in New York. The principal place of business of Lac d’Amiante was in Quebec, Canada. However, Foster Wheeler Corp. preserves equal treatment of all *505 claimants under the same policy. The same choice of law principles would be applied to all policyholders and claimants. Various claims against the same Midland policyholder would be governed by the same law, the law of that policyholder’s principal place of business for a policy the risks of which are located in multiple states. Thus, all claimants of that policyholder would be treated equally. Foster Wheeler Corp. is consonant with UILA’s purpose of establishing equitable administration of the estate, as opposed to the equal treatment of all creditors. As the policyholders indicate, it is possible to administer the estate equitably by applying the same choice of law principles to all claims, even though the equal application of the principles would not produce the same results. (See Viacom, Inc. v Transit Cas. Co., 138 SW3d 723, 726 [Mo 2004].)
Applying Foster Wheeler Corp. to liquidation proceedings also makes it easier to resolve issues of coinsurance or priority of insurance — that is, determining which policies are primary or excess to one another when multiple policies cover the same risk. Ranking Midland’s policies and the policies of other insurance companies that are not in liquidation would likely be determined under the same law if a choice of law issue arose, especially if those multiple policies were purchased by the same policyholder. If Foster Wheeler Corp. did not apply to liquidation proceedings, it would be difficult to rank Midland’s policy with other policies if the other policies are to be interpreted under another state’s laws.
The liquidator acknowledges that it is possible to apply the Restatement’s “grouping of contacts” analysis, but asserts that it would simply not be as efficient or cost effective as imposing New York law, as LAQ apparently would require. (Opposing mem at 20.) Of course, applying one state’s law to every claim in the liquidation saves the expense of researching and applying other states’ laws. However, every insurance liquidation needs efficient and cost effective administration. Such concerns do not dictate the application of any state’s law. In essence, the liquidator advocates that the law of the forum should be applied to all policies of the insurance company in liquidation. Following the liquidator’s argument, New York law would apply to every insurance policy of every insurer in liquidation in New York.[8] However, the Restatement cautions that the simplicity of a *506 choice of law rule and its easy application “should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable results.” (Restatement [Second] of Conflict of Laws § 6, Comment j.)
Adopting the liquidator’s approach would actually undermine the purpose of UILA. Rather than promoting order, the liquidator’s approach would wreak havoc on insurance liquidations. UILA was intended to promote a uniform approach among states, and to coordinate the liquidation proceeding of the insurer in one state with the ancillary receivership proceedings in other states where assets of the defunct insurer may be located. Applying one state’s law would promote uniformity within a liquidation proceeding in New York, at the expense of maintaining the uniformity of the law governing insurance liquidations in other states. To reject the application of the Restatement would leave New York alone among the 50 states, and could disrupt the orderly process of administering the proceeds of the estate being held in ancillary proceedings in other states.
Fifty-six sister-state guaranty associations “stand in the shoes” of Midland and pay many thousands of Midland policyholder claims, up to various statutory monetary caps. (Matter of Midland Ins. Co., 18 Misc 3d 1117[A], 2008 NY Slip Op 50110[U], *4 [2008], supra.) The guaranty associations are in the same creditor class as policyholders. (See Insurance Law § 7434 [a] [1] [ii].) This court has no jurisdiction over the guaranty associations to direct them to apply New York law to the claims that they have evaluated and paid. If a guaranty association paid a claim applying New Jersey law, an issue may arise under LAQ as to whether Midland is bound by the guaranty association’s determination. However, guaranty associations of other states might decline to pay policyholder claims on behalf of Midland if there is a substantial risk that their claims will not be paid, which defeats the purpose of a guaranty association.
In sum, to the extent that LAQ requires that, in a conflict of laws analysis, predominant weight is given to the place where the liquidation is pending for policy reasons, LAQ is contrary to Foster Wheeler Corp. Therefore, LAQ is no longer controlling law on the issue of the law applicable to the interpretation of Midland’s policies. If the denied claims of the policyholders on this motion presented a choice of law issue, the liquidator should have followed the “grouping of contacts” approach of the Re *507 statement. Where the risks of a Midland policy are located in more than one state, the liquidator should reconsider his analysis by applying the rule announced in Foster Wheeler Corp.
On this motion, it cannot be determined whether analysis of the policyholders’ denied claims under the Restatement’s “grouping of contacts” approach would have resulted in allowances of their claims. It may be possible for the liquidator to defend his denial of the policyholders’ claims even when applying the Restatement’s approach. This must be determined on a claim-by-claim basis. However, the court strongly suggests that the Liquidation Bureau review all of the denied claims again before presenting them to the Special Referee. A review of all the denied claims following resolution of the phase 1 and 2 issues could lead the Liquidation Bureau to allow claims that it previously denied. This conserves judicial resources dedicated to hearing objections to denied claims.
III.
Nevertheless, this court does not suggest that Foster Wheeler Corp. has overruled the result in LAQ, that the court overseeing Midland’s liquidation was not bound by the determination of another court to accept the coverage interpretations of an underlying policy to which Midland’s excess policy followed form. “[A]bsent the application of the doctrines of res judicata or collateral estoppel, [the court] find[s] no basis upon which to bind the excess carriers to an interpretation of an underlying policy made in an action to which they were not parties or in privity with a party.” (Travelers Ins. Co. of Ill. v Eljer Mfg., Inc., 307 Ill App 3d 872, 884-885, 718 NE2d 1032, 1041 [1st Dist 1999].) Because Midland should have been dismissed from the Federal District Court’s action when it was placed into liquidation, Midland would not have been bound by the Federal District Court’s determination of the interpretations of the underlying AHAC policy.
Moreover, as Justice Beverly Cohen indicated, an excess policy following form adopts only the contract language of the underlying policy. When a court must interpret an excess policy following form and the underlying policy, that court would generally not render different interpretations of two policies with identical language. The court would first analyze and interpret the primary policy, and then apply that interpretation to the excess policy, citing the fact that the excess policy follows form. (See e.g. Dow Chem. Co. v Associated Indem. Corp., 724 F Supp 474, *508 480 [ED Mich 1989] [“the Court must focus on the language of the relevant primary insurance policies”]; Associated Indem. Corp. v Dow Chem. Co., 814 F Supp 613, 618 [ED Mich 1993]; Industrial Indem. Co. v Apple Computer, Inc., 79 Cal App 4th 817, 840, 95 Cal Rptr 2d 528, 542-543 [1st Dist 1999].) Thus, the excess policy following form predictably would adopt the coverage determinations of the underlying policy.
IV
The cross motion of Swiss Re is denied. CMO No. 1 does not permit cross motions. Permitting cross motions permits other parties to submit additional papers on the issues, which disrupts the agreed upon briefing schedule among the liquidator, the MPHs, and the reinsurers. In view of the reinsurers’ limited role as intervenors on specific issues, CMO No. 1 allows reinsurers to participate after the policyholders and the liquidator have submitted papers. Swiss Re, and the other reinsurers, having stipulated to CMO No. 1, are bound by its procedure.
Were the court to consider Swiss Re’s cross motion on the merits, its cross motion would be denied, for the reasons already discussed.
Finally, the policyholders argued, in a passing footnote, that LAQ would not apply to the Babcock & Wilcox Company Asbestos PI Trust, because the trust was created as a result of a bankruptcy proceeding. (Mem at 14 n 10.) The court does not address this argument because this argument is specific to this policyholder, and should therefore be raised before the Special Referee.
Conclusion
Accordingly, it is hereby ordered that the policyholders’ motion, styled as a motion for partial summary judgment, is granted, and when reviewing whether the liquidator properly denied each policyholder’s claim, the Special Referee is instructed that any review of the law applicable to each policy shall follow the “grouping of contacts” of the Restatement (Second) of Conflict of Laws and New York case law, giving predominant weight to the insured’s principal place of business where appropriate, as articulated in Certain Underwriters at Lloyd’s, London v Foster Wheeler Corp. (36 AD3d 17, 27 [2006]); and it is further ordered that the cross motion by Swiss Re is denied.

. The order provides, in relevant part:
“a) The Liquidator shall, on a periodic basis, prepare a list of claims recommended for disallowance. The Liquidator shall serve each claimant with a ‘Notice of Recommendation of Disallowance.’ . . . The Notice of Recommendation of Disallowance shall advise each claimant that:
“i) The claimant’s claim has been recommended for disallowance by the Liquidator;
“ii) The claimant may object to the Notice of Recommendation of Disallowance by serving written objections on the Liquidator that must be received by the Liquidator within sixty days of the date of the Notice of Recommendation of Disallowance;
“hi) If the claimant fails to timely object to the Liquidator’s recommendation for disallowance, the Liquidator shall submit an ex-parte motion to this Court for an order approving his recommendations of disallowance of the claimant’s claim.
“iv) Each claim for which a timely objection is received will be referred to the referee appointed by the Court, pursuant to the *491 Order dated August 3, 1987, to hear and report on the validity of the claimant’s objections and that the Liquidator will notify each claimant of the time and place of the hearing on the claimant’s claim.”
For a discussion of the procedure for judicial approval of allowed claims, see Matter of Midland Ins. Co. (18 Misc 3d 1117[A], 2008 NY Slip Op 50110[U], *3-4 [Sup Ct, NY County 2008]). The allowed claims procedure is currently being revised. (Ibid.)

. For this motion, the liquidator defines MPHs as Fortune 1000 companies with long-tail claims, such as asbestos, nonasbestos products/toxic torts and environmental claims. The liquidator’s list of claims has expanded to include sexual molestation claims.

. The MPHs are American Standard, Inc., the Babcock & Wilcox Company Asbestos PI Trust, CBS Corporation, CertainTeed Corporation, Congoleum Corporation, Echlin, Inc., the Flintkote Company, Foster Wheeler LLC, International Paper Company, National Service Industries, Rapid-American Corporation, and Uniroyal Holding, Inc.

. The reinsurers intervening in phase 1 are: (1) Swiss Reinsurance America Corporation, GE Reinsurance Corporation, and Westport Insurance Corporation (collectively Swiss Re); (2) R & Q Reinsurance Company and Riunione Adriatica di Sicurta; (3) American Centennial Insurance Company; (4) Everest Reinsurance Company; and (5) New England Reinsurance Corporation.

. “An excess policy may be written in two forms: as a stand-alone policy or as a policy that ‘follows form.’ . . . [A] follows form excess policy incorporates by reference the terms of the underlying policy and is designed to match the coverage provided by the underlying policy. In the event of a conflict in terms between a following form excess policy and primary policy, the terms of a following form excess policy control to the extent that the coverage is invoked. Following form excess policies also commonly contain unique provisions that the underlying primary policy does not contain, such as additional exclusions or additional coverage.” (23-145 Holmes’ Appleman on Insurance 2d § 145.1 [2008].)

. The Court of Appeals stated,
“The Second Restatement, in addition to the traditionally determinative choice of law factor of the place of contracting, offers four other factors to be considered in establishing this ‘most significant relationship’: the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties. . . .
“We have previously noted that even in contract cases, where grouping of contacts is the primary analytical tool, in certain instances ‘the policies underlying conflicting laws in a contract dispute are readily identifiable and reflect strong governmental interests, and therefore should be considered’.” (Zurich Ins. Co. *497 v Shearson Lehman Hutton, 84 NY2d 309, 317-319 [1994] [citations omitted]; see also Certain Underwriters at Lloyd’s, London v Foster Wheeler Corp., 36 AD3d 17, 27 [1st Dept 2006], affd 9 NY3d 928 [2007].)

. The National Conference of Commissioners on Uniform State Laws adopted UILA in 1939, and New York adopted UILA the year after. (L 1940, *500 ch 631; see Insurance Law § 7408 et seq.) By 1981, 31 states had adopted UILA. (G. C. Murphy Co., 54 NY2d at 77.) However, “[t]he Uniform Insurers Liquidation Act (1939) was withdrawn from recommendation for enactment by the National Conference of Commissioners on Uniform State Laws in 1981 due to it being obsolete.” (Uniform Insurers Liquidation Act [1939], 13 [part II] ULA 126 [2002].)

. The liquidator conceded at the conference on this motion that the Liquidation Bureau was not applying New York law to the insurance policies in Midland’s liquidation that covered environmental risks.